Old Republic Insurance Company and Old Republic Union Insurance Company (collectively "Old Republic") appeal from a judgment entered on a jury verdict in favor of Tom Lanier for $2,940,000 in compensatory damages, and $25 million in punitive damages. The dispositive issue on appeal is whether Lanier's action was barred by the doctrine of res judicata. We conclude that it was, and we therefore reverse and remand.
This litigation already has a considerable history. See Old Republic Ins. Co. v. Lanier, 644 So.2d 1258 (Ala. 1994) ("Lanier II"). The business relationships out of which the litigation arose are described in Lanier I and Lanier II, and will not be discussed here except as to those points pertinent to the new issues raised by this appeal.
At the core of these relationships are two substantively identical agreements between Lanier and Old Republic (collectively the "Agreement"), Lanier I, 644 So.2d at 1259, which were executed in 1987. Lanier II,936 F. Supp. at 840. Pursuant to the Agreement, Lanier was to serve as an agent for Old Republic "in connection with an insurance program being developed to service the logging industry." Lanier I, 644 So.2d at 1259. More specifically, it "authorized Lanier to solicit and bind workers' compensation and employer's liability coverage, automobile coverage, and inland marine insurance in Alabama, Florida, and Georgia." Brief of Appellant, at x-xi. The Agreement contained the following pertinent provisions:
"ARTICLE IX. ARBITRATION
 "As a precedent to the institution of any action at law or in equity hereon, any dispute arising out of this Agreement shall be submitted to the decision of a board of arbitration composed of two arbitrators and an umpire meeting in the City of Chicago, Illinois, unless otherwise agreed.
". . . .
"ARTICLE X. TERMINATION OF AGREEMENT
 "A. This Agreement shall be terminable at any time without cause by either party giving to the other party at least [90] days' prior notice of its intent to terminate.
 "B. This Agreement shall terminate ten (10) days after the effective date of written notice given by either party to the other party in the event of fraud, insolvency, or gross and willful misconduct on the part of other such party, unless cured within the ten day period. Such notice of termination shall state the *Page 924 
grounds that the party giving notice relies upon in giving such notice of termination.
 "C. This Agreement shall be terminable by [Old Republic] upon [Old Republic's] giving thirty (30) days' written notice to [Lanier] in the event of default if [Lanier] shall fail to correct such default within such period.
 "D. In the event of a termination of this Agreement by [Old Republic] for cause under paragraphs B or C above, the ownership of all expirations on insurance written hereunder shall belong to [Old Republic]. Otherwise the ownership of all insurance expirations shall belong to [Lanier], but only if [Lanier] has made all accountings, remitted all premiums due, and filed proof of such actions with [Old Republic].
 "E. With any termination of this Agreement, [Lanier] shall cease to have any further authority hereunder, except that if this Agreement is terminated by prior written notice without cause, [Lanier] shall have the following limited authority as to the insurances written hereunder and which are still in force:
 "1. To continue insurances for their remaining unexpired terms, subject to [Old Republic's] approval or as may be required by law, for which [Old Republic] shall pay [Lanier] commissions in effect at the time of any such renewals;
 "2. To issue and countersign endorsements, with respect to coverages under Schedule A, but only with prior written approval of [Old Republic];
 "3. To collect, receive and receipt for premiums becoming due on such policies and endorsements
 "The foregoing limited authority shall automatically terminate upon the cancellation, expiration or other termination of the insurances written hereunder or upon [Lanier's breach of any of the limitations on such authority.
 "F. Termination by prior notice or otherwise shall not be construed as fully discharging either party's financial obligations hereunder, which shall be fully discharged as speedily as possible upon termination."
Additionally, in January 1991, Lanier contacted Rickie Wayne Chancy and Jeffrey R. Stoutamire, who owned Chancy-Stoutamire, Inc. ("C-S"), a "major [insurance] competitor" in Florida. Lanier proposed that C-S "com[e] in and writ[e] their business through [his] contract with Old Republic as a subagent." (Reporter's Transcript, at 829.) Consequently, in January 1991, Lanier and Chancy executed a "letter of intent," stating in pertinent part:
 "It is the intent of J.T. Lanier Associates and Chancy-Stoutamire, Inc. hereinafter referred to as agencies to join together in a marketing plan for the states of Florida and Georgia.
 "It is further intended that these agencies place all qualified mechanized logging business in the current program as specified in an Agency Agreement between John T. Lanier dba J.T. Lanier Associates and [Old Republic].
". . . .
 "It is further intended that non-compete agreements and formal agency marketing plans will be signed by each of the parties prior to March 1, 1991."
(Emphasis added.)
Also in January 1991, Lanier sent to Charles D. Jordan,[1] a letter, which stated in pertinent part: *Page 925 
 "I hereby authorize [Old Republic] to set up a company number for Chancy-Stoutamire, Inc. . . . The intent is for Chancy-Stoutamire, Inc. to submit all of the mechanized logging business that needs the underwriting requirements of the program for the State of Florida and the State of Georgia.
". . . .
 "Chancy-Stoutamire's agency contract is to be an addendum to J.T. Lanier Associates' and should be contracted a sub-agent under our Agency Agreement.
 "Chancy-Stoutamire will have the authority to solicit and bind coverages."
(Emphasis added.)
No noncompetition agreement between C-S and Lanier was ever executed. Moreover, Lanier and C-S had an "understanding" that the subagency could be canceled arbitrarily by either party, at any time.
By mid-1992, Lanier's relationships with Old Republic and C-S had become strained. On June 1, C-S wrote a letter to Old Republic expressing an interest in terminating its subagency with Lanier and commencing a direct agency relationship with Old Republic. The letter stated in pertinent part:
 "Our agency has represented Old Republic through J.T. Lanier Associates for the past eighteen months. We fell that the job we have done was good for both Old Republic [and] J.T. Lanier . . . as this is reflected in our agency loss runs.
 "J.T. Lanier Associates has previously placed a restriction on our agency which hindered growth and profitability. They are now wanting to further restrict our profitability and we feel it is in our best interest to seek another market. We have been very pleased with the job that . . . Old Republic [has] done our agency.
 "Before talking to any other carriers, we would like to request a direct contract with Old Republic. . . . If this is possible, we would like to have all our business transferred as soon as possible. We would also request that no further data from our agency be sent to J.T. Lanier Associates."
Old Republic forwarded this letter to Lanier.
On June 16, 1992, Lanier wrote to Old Republic, stating:
 "I am continuing to correspond with [C-S] to reach a satisfactory sub-agency arrangement between them and myself. . . . I do not intend to relinquish my rights to the exclusive agency relationship for Georgia, Alabama, and Florida and I do not intend to allow [C-S] to represent Old republic on a direct basis. Until then, we should operate under the present sub-agency relationship."
{Emphasis added.) Subsequent attempts to resolve the difficulties between C-S and Lanier were, however, unsuccessful. Moreover, in a letter dated June 25, 1992, Old Republic accepted the offer of C-S to establish a "direct [agency] contract" with Old Republic.
On July 27, 1992, Old Republic formally notified Lanier of its intent to terminate his agency on October 26, 1992, that is, after 90 days. Effectively, however, Old Republic terminated the agency immediately. More specifically, Old Republic immediately caused both (1) writing new policies and (2) renewing existing policies generated by Lanier.
On November 12, 1992, Lanier filed the six-count complaint commencing this action against Old Republic, C-S, Charles Jordan, Rickie Wayne Chancy, and Jeffrey Stoutamire.[2] See Lanier I, *Page 926 
644 So.2d at 1259. Counts one to three contained claims against Old Republic and Jordan. Counts four to six contained claims against the C-S defendants. Specifically, count one contained a "misrepresentation" claim against Old Republic and Jordan. Id. Count one alleged that "[i]n negotiations leading to execution of the Agency Agreement, Old Republic . . . represented to . . . Lanier that [his] agency would be the exclusive agency for logging business in the states of Alabama, Georgia and Florida." It further alleged that "Lanier discovered the representations were false in June 1992." Count two contained a breach-of-contract claim, alleging breach of the Agreement. More specifically, count two alleged:
 "27. In July, 1992, [Old Republic] attempted to terminate the agency agreements . . . through written notice and claimed the contracts were terminated effective October 26, 1992.
". . . .
 "31. Plaintiff avers the contacts can only be terminated on May 1st of each year and by the giving of 90 days notice prior to May 1st of each year.
 "32. [Old Republic has] refused to accept any business from J.T. Lanier Associates since October 26, 1992.
 "33. Plaintiff avers [Old Republic has] breached the agency contracts . . . by refusing to accept any business after October 26, 1992.
 "34. As a proximate consequence of the breach, [Lanier has] suffered a loss of profits, loss of business opportunity, loss of clients and will be caused to suffer similar losses in the future."
Count three alleged as follows:
 "36. After notice of the termination was forwarded to Lanier, Old Republic . . . began disclosing information regarding the clients of J.T. Lanier 
Associates to Chancy-Stoutamire and other agents and began accepting new insurance from these clients written by agents other than J.T. Lanier 
Associates.
 "37. The clients and the information pertaining to their accounts are the property of the Plaintiff.
 "38. Defendants . . . converted the client information for their own use and caused Plaintiff to lose the value of the accounts.
 "39. The conversion was intentional, malicious and contumely [sic]."
In Lanier I, this Court construed count three as an allegation that Old Republic had "converted for [its] own use Lanier's clients and information pertaining to those client's accounts, thus interfering with his business relationships." Id. at 1259.
Old Republic moved to compel arbitration of the dispute on the basis of Article IX of the Agreement. The trial court "ordered arbitration as to the breach of contract claims, but denied the motion [to compel arbitration] as to the claims of fraud . . . and . . . conversion." Id. Lanier I represented, of course, this Court's disposition of the arbitration issues. Specifically, we reversed the order of the trial court as to the fraud claim, but affirmed the order of the trial court as to the breach-of-contract claim. Id. at 1263. We also affirmed the trial court's order as to the conversion claims. We stated: "Count three, alleging that Old Republic . . . converted Lanier's clients and client information for [its] own use, `appears to raise issues largely distinct from the central conflict over the interpretation and performance of the [agreements themselves].'" Id. (quoting Mediterranean Enters., Inc. v. Ssangyong, 708 F.2d 1458 (9th Cir. 1983) (emphasis added)).
On July 2, 1993, while the appeal in Lanier I was pending, Lanier amended his complaint to add count eight, which alleged *Page 927 
that Old Republic had interfered with the subagency contract between Lanier and C-S. After remand, Old Republic moved to compel arbitration of the interference-with-subagency claim. That motion was denied.
In that posture, the dispute proceeded to arbitration. In addition to compensatory damages under his breach-of-contract claim, Lanier sought punitive damages, as well as compensation for mental anguish, under his fraud claim. On July 14, 1995, after a four-day arbitration proceeding, the arbitration panel awarded Lanier $400,000 in compensatory damages on his breach-of-contract claim. However, it ruled in favor of Old Republic on the fraud claim. A judgment was entered in the United States District Court for the Middle District of Alabama confirming that award. See Lanier II, supra.
On August 4, 1997, Old Republic moved for a summary judgment on the conversion and interference-with-subagency claims still pending in the trial court. It argued, among other things, that the claims were barred by the doctrines of res judicata and collateral estoppel. On August 18, 1997, Lanier moved the court to allow him further to amend his complaint by adding a "Third Cause of Action Against Old Republic." Specifically, he alleged:
 "[A]fter his agency was terminated by [Old Republic, it] interfered with [his] ownership of expirations by: (a) using the expiration data . . . to review existing coverages and renew policies of [his] clients; (b) giving the expiration data to agents to enable agents to issue quotes to [his clients]; (c) competing with [him] for [his] clients."
Old Republic moved to strike the amendment on the grounds of res judicata and "similar principles."
On September 4, 1997, the trial court granted Old Republic's summary-judgment motion as to the conversion claim. However, the trial court granted Lanier's motion to add the claim alleging interference with his ownership of the expirations.[3] Over Old Republic's motions for a judgment as a matter of law, both claims, namely, the claim alleging interference with the subagency and the claim alleging interference with ownership of the expirations, were submitted to the jury.
The jury awarded Lanier $27,940,000, which it apportioned between the two claims. On the subagency claim, the jury awarded $1.36 million in compensatory damages and $10 million in punitive damages. In the expirations claim, it awarded 1.58 million in compensatory damages and $15 million in punitive damages. The court entered a judgment on that verdict; Old Republic's post-trial motions were denied by operation of law. From that judgment, Old Republic appealed. reiterating its contention that the arbitration of this dispute was res judicata as to its subsequent litigation. We agree with this contention.
As we stated in Hughed v. Martin, 422 So.2d 188, 190 (Ala. 1988):
 "Res judicata is a broad, judicially developed doctrine, which rests upon the ground that public policy, and the interest of the litigants alike, mandate that there be an end to litigation; that those who have contested an issue shall be bound by the ruling of the court; and that issues once tried shall be considered *Page 928 
forever settled between those same parties and their privies."
"The . . . elements of res judicata are (1) a prior judgment on the merits, (2) rendered by a court of competent jurisdiction, (3) with substantial identity of the parties, and (4) with the same cause of action presented in both actions." Equity Resources Management, Inc. v. Vinson, 723 So.2d 634, 636 (Ala. 1998). "If those four elements are present, then any claim that was, or that could have been, adjudicated in the prior action is barred from further litigation." Id. (emphasis added).
In Alabama, as elsewhere, an arbitration award "partakes of the nature of a judgment or decree of a competent court, and may be pleaded in bar of a subsequent suit founded on the same [cause of action]." Glens Falls Ins. Co. of New York v. Garner, 229 Ala. 39, 41, 155 So. 533, 534
(1934). See also American Ins. Co. v. Messinger, 43 N.Y.2s 184, 189-90, 40 N.Y.S.2d 36, 371 N.E.2d 798, 801 (1977) ("doctrines of [res judicata and collateral estoppel] apply as well to awards in arbitration as they do to adjudications in judicial proceedings"); Manu-Tronics, Inc. v. Effective Management Sys., Inc., 163 Wis.2d 304, 311, 471 N.W.2d 263, 266
(Wis.App. 1991) ("Essential to arbitration remaining useful is the elementary principle that the doctrines of res judicata and collateral are applicable to arbitration awards"); Restatement (Second) of Judgments § 84(1) (1982) ("a valid and final award by arbitration has the same effects under the rules of res judicata, subject to the same exceptions and qualifications, as a judgment of a court").
Lanier does not challenge these general principles. He relies, however, on Restatement (Second) of Judgments § 26 (1982), which states that the doctrine of res judicata does not necessarily apply when "[t]he plaintiff was unable to rely on a certain theory . . . or to seek a certain remedy or form of relief in the first action because of . . . limitations on the subject-matter jurisdiction of the courts or restrictions on their authority to entertain multiple theories or demands for multiple remedies." He contends that the arbitration panel never acquired subject-matter jurisdiction over the two "claims" he eventually litigated. This is so, because, he argues, this Court in Lanier I ordered only the arbitration of his claims of fraud and breach of contract. Thus, he concludes, the arbitration panel did not have subject-matter jurisdiction of his claims of interference with (1) the subagency and (2) the expirations. We disagree with this conclusion.
In Alabama "[i]t is well-settled that `the principal test for comparing causes of action [for the application of res judicata] is whether the primary right and duty or wrong are the same in each action.'" Wesch v. Folsom, 6 F.3d 1465, 1471 (11th Cir. 1993) (emphasis added), cert. denied sub nom. Sinkfield v. Wesch, 510 U.S. 1046, 114 S.Ct. 696, 126 L.E.2d 633
(1994). "Res judicata applies not only to the exact legal theories advanced in the prior case, but to all legal theories and claims arising out of the same nucleus of operative facts." Id. (emphasis added). "The question is whether the same evidence substantially supports both actions. . . . It is considered the same cause of action when the same evidence is applicable in both actions." Hughes Martin, 533 So.2d 188,191 (Ala. 1988). As it is sometimes stated, "`[w]here two successive suits seek recovery for the same injury, a judgment on the merits operates as a bar to the later suit, even though a different legal theory of recovery is advanced in the second suit.'" Silcox v. United Trucking Serv., Inc., 687 F.2d 848, 852 (6th Cir. 1982); Harrington v. Vandalia-Butler *Page 929 
Bd. of Educ., 649 F.2d 434, 437 (6th Cir. 1981); see also Kale v. Combined Ins. Co. of America, 924 F.2d 1161, 1166 (1st Cir.), cert. denied, 502 U.S. 816, 112 S.Ct. 69, 116 L.E.2d 44 (1991).
As A practical matter, if a plaintiff could avoid the application of res judicata to disputes he submitted to arbitration simply by restarting the dispute in terms of a different legal theory, arbitration would be a waste of time and resources. Other courts have recognized this principle. For example, Goldstein v. Droft, 353 F.2d 484 (2d Cir. 1965) (per curiam) stated:
 "As with appellant's other claims on the merits, the difference between the issues litigated before the arbitrators and those attempted to be presented in this subsequent litigation is on of semantics only. . . . Arbitration would be of little value if the entire controversy or any part thereof could be reopened later by a mere change in the words or phrases used to characterize the matters included in the claim the arbitrators had rejected."
Id. at 484.
See also Fink v. Golenbock, 238 Conn. 183, 680 A.2d 1243 (1996), where the court concluded that the arbitration of claims by Theodore Fink, a corporate shareholder, against Joan Magner, a corporate employee, for breach of an employment contract and a covenant not to compete, pursuant to an agreement requiring arbitration of "[a]ny disputes arising under [an employment contract]," 238 Conn. at 196, 680 A.2d at 1252 (emphasis added in Fink), barred the subsequent litigation in a shareholder's derivative action by Fink against Magner of claims that Magner "wrongfully converted the assets of the corporation, . . . tortiously interfered with the reasonable business expectancies of the corporation, . . . and . . . violated the Connecticut Unfair Trade Practices Act [`CUTPA']," 238 Conn. at 185, 680 A.2d at 1247. The court explained:
 "Our examination of the claims that were actually decided in the arbitration proceeding and those that could have been decided because they were within the scope of the submission persuades us that the claims asserted in the present action are barred by res judicata. . . .
 "The tort claims and the claim for a violation of CUTPA that the plaintiff litigated in this action could have been brought in the arbitration proceeding. These types of actions are encompassed within the broad and unrestricted submission agreed to by the parties. The predicate for these claims is a dispute arising under the employment agreement between Magner and the plaintiff because it is this agreement that establishes the employment relationship from which the underlying conduct that forms the basis of the dispute stems. . . . Because the factual underpinnings of these claims and factual underpinnings of these claims and those that were actually arbitrated are the same, we are persuaded that the transactional test is satisfied."
238 Conn. at 196-97, 680 A.2d at 1252 (emphasis added) (footnote omitted).
This Court has not construed the phrase "arising under" as broadly as Fink. See Lanier I, 644 So.2d at 1262 (Alabama interprets the phrase "arising under" more narrowly than phrase "arising out of or relating to"). Nevertheless, the issue in this case is the same as the issue in Fink, namely, whether the claims Lanier litigated "were within the scope of the submission" to arbitration. 238 Conn. at 196, 680 A.2d at 1252
(emphasis added). We conclude that they were. In fact, Lanier I ordered the arbitration of all "`"disputes and controversies relating to the interpretation of the contract and matters of performance."'" 644 So.2d at 1262 (emphasis *Page 930 
added) (quoting with approval Mediterranean Enters., Inc. v. Ssangyong,708 F.2d 1458, 1464 (9th Cir. 1983)). Of course, that order included Lanier's claims alleging (1) fraud and (2) breach of contract. But we did not intend to restrict the subject-matter jurisdiction of the arbitration panel to claims stated in those specific terms. Instead, consistent with our rules of res judicata, we limited the scope of arbitration only to the cause, or causes of action that the theories of breach of contract and fraud were designed to remedy. As previously noted, our comment describing Lanier's claim of conversion as raising issues `distinct from the central conflict over the interpretation and performance of the [agreements themselves]," Lanier I, 644 So.2d at 1263, was clearly limited by the statement that that "appear[ed]" to be the case. Id. Lanier's right to avoid an arbitration judgment binding on other matters turned on what we previously described as the appearance of things becoming a reality. Such is not the case.
Actually, this case involves two causes of action. One cause of action was Old republic's alleged wrongful termination of the Agreement. The second cause of action was Old Republic's direct dealing with C-S in disregard of the alleged exclusive agency. Thus, if the claims alleging interference with the expirations and with the subagency were based on the same causes of action as the claims alleging breach of contract and fraud, then the former claims were barred by the doctrine of resjudicata.
 I. Interference with Expirations/Breach of Contract
This cause of action was arbitrated in connection with Lanier's breach-of-contract claim. A comparison of Lanier's claims alleging breach of contract and interference with expirations reveals that the "primary right and duty or wrong" complained of are the same in both. More specifically, the gravamen of each claim is that Old Republic wrongfully, that is, prematurely, terminated Lanier's agency. A primary component of damages flowing from that termination was, as Lanier's breach-of-contract count stated, the "loss of clients and . . . similar losses in the future."
The trial court ordered depositions of members of the arbitration panel in order to determine the basis for awarding Lanier $400,00 on his breach-of-contract claim. Excerpts of those depositions were read at trial. The testimony revealed that the award was based on a finding that Old Republic had breached two specific provisions of the Agreement, namely, Article X.A. ("This Agreement shall be terminable at any time without cause by either party giving to the other party at least [90] days' prior notice of its intent to terminate"); and X.D. ("In the event of a termination of this Agreement by [Old Republic] for cause under paragraphs B or C above, the ownership of all expirations on insurance written hereunder shall belong to [Old Republic]. Otherwise, the ownership of all insurance expirations shall belong to [Lanier]. . . .") More specifically, the panel concluded that "the breach occurred because the 90-day period was not . . . followed through on by Old Republic," and that Old Republic was "soliciting business during that 90-day period." (Reporter's Transcript, at 1725.)
Lanier contends that the "claim for interference with his expirations did not even arise until after October 26, 1992, the date his termination became effective. Prior to this date Lanier was an agent and the agency provisions regarding ownership of expirations did not apply." Brief of Appellee, at 12-13. Thus, he argues, he had no cause of action for interference *Page 931 
with expirations that the arbitrators could have considered.
This argument, however, overlooks the fact that Old Republic treated the agency as terminated immediately, that is, as of July 27, 1992. As the arbitrators found, Old Republic began "interfering" with Lanier's expirations as of that date. In other words, as of July 27, Old Republic actually (1) treated the Agreement as terminated; (2) disavowed Lanier's agency; and (3) began using the expirations. The arbitration panel necessarily considered that interference when it awarded Lanier $400,000 in damages based on Old Republic's breach of Article X.D. and the use of Lanier's expirations between July 27 and October 26.
Moreover, count two of the complaint, in which Lanier sought compensation for breach of contract, specifically requested future "loss of profits, loss of business opportunity, [and] loss of clients." Relief for these future losses is precisely the species of relief to which Lanier claims to be entitled for interference with the expirations since October 26, 1992. The arbitrators rejected Lanier's claim for those future losses. Obviously, the correctness of the arbitration award is not before us for review. It is equally obvious (1) that Lanier's cause of action for wrongful termination of the Agreement accrued before October 26, 1992; (2) that is was presented to the arbitration panel under the theory of breach of contract;[4] and (3) that the claim for interference with expirations based on that same cause of action is now barred by the doctrine of res judicata.[5]
 II. Interference with Subagency/Fraud
The second cause of action was Old Republic's direct dealing with C-S is disregard of the alleged exclusive agency. It was arbitrated in connection with Lanier's fraud claim. Lanier's theory of the case — both in arbitration and in litigation — was that Old Republic engaged in a plan or scheme to "gain control of the marketing of the timber program and to put Lanier out of business." Arbitration Brief, at 17. Also, he argued, "[t]here is no doubt that Old Republic's actions were intentional and designed with the specific purpose to steal the program from Lanier and then drive him out of business, thereby eliminating its main competition.' Id. In his brief to this Court, he makes the same arguments, stating: "Clearly, the elimination of Lanier to *Page 932 
gain control of the program was [Old Republic's] main goal." Brief of Appellee, at 49.
Under this theory, one of the means by which Old Republic sought to implement the scheme was misrepresentation regarding the question whether an exclusive agency existed. Another means was its dealings with C-S. Old Republic's plan to "steal the program," according to Lanier, began in, or around, December 1991, and included its dealings with C-S. Id. at 18. Indeed, Lanier's relationship with C-S was an integral part of his "program."
In order to demonstrate Old Republic's methods and intentions toward Lanier's agency, Lanier presented to the arbitration panel evidence of the mid-1992 correspondence and transactions between Old Republic and C-S leading to the dissolution of the subagency. His arbitration brief outlined those facts in detail as evidence that Old Republic intentionally "set about destroying [his] agency." Id. at 13-15. To the arbitration panel, Lanier argued strenuously that these transactions warranted the imposition of punitive damages against Old Republic under Lanier's fraud claim. In his brief to this Court, under the heading "Degree of Reprehensibility," he relies on the same facts — set forth in substantively identical terms — to justify the jury's punitive damages award on is expirations and subagency claims. Brief of Appellee, at 39-40. He argues that those transactions "paint a vivid picture of connivance and deceit." Id. at 39 (emphasis added).
Moreover, the compensatory-damages calculations Lanier submitted to the arbitration panel mirror the calculations he presented to the jury. To the arbitration panel, he argued that the "value of [his] exclusive rights to the program include[d the] investment or override opportunity" he enjoyed through his subagency with C-S. Arbitration Brief, at 9. He argued that "[w]ithout Old Republic's behind the scenes involvement, C-S would have continued as a sub-agent." Id. at 10. Both to the panel and to the jury, Lanier compensable loss was $2.94 million, which included the difference between the value of Lanier's agency before "Chancy-Stoutamire went direct" and the value of his agency after his "relationship with Old Republic was terminated." (Reporter's Transcript, at 1048.) (Emphasis added.) See Clerk's Record, at 1603.
Relying, apparently, on this testimony, the jury awarded precisely $2.94 million in compensatory damages. Lanier thus was awarded damages in the litigation for the same injuries for which he had sought damages in arbitration. This, he could not do. See Silcox v. United Trucking Serv., Inc., 687 F.2d 848, 852 (6th Cir. 1982).
Additionally, Lanier conceded to the panel:
 "Even though there is a claim for conversion of expirations still pending in the lawsuit, Old Republic has denied any liability. . . . The claims which have been presented to this panel are not part of the conversion claim and a jury will never be asked to consider them.
 "This issues which have been presented to this panel comprise the heart of Lanier's claims against Republic."
Arbitration Brief, at 22 (emphasis added).
Finally, it must not be overlooked that Lanier's subagency claim arose under the Agreement containing the arbitration clause. This is so, because the subagency itself arose under the Agreement, that is, it "relat[ed] to the interpretation of the contract and matters of performance." Lanier I, 644 So.2d at 1262. The Agreement was expressly referenced in the January 1991 letter of intent, which set forth the purpose of the relationship between *Page 933 
Lanier and C-S. Those purposes were further described in the Lanier-to-Jordan letter, which described the proposed subagency "contract" as "an addendum to J.T. Lanier Associates, to be "contracted as a sub-agent under [the] Agreement." (Emphasis added.) Thus, because the subagency arose under the Agreement, claims against a party to the Agreement for that party's interference with the subagency also arise under the Agreement.
These and many similar considerations convince us that the "nucleus of operative facts," Wesch v. Folsom, 6 F.3d 1465, 1471, which Lanier characterizes as "connivance and deceit" for purposes of his interference-with-subagency claim, constitutes the same cause of action that he presented to the arbitration panel as a basis for his fraud claim. Thus, the interference-with-subagency claim was "within the scope of the submission," Fink, 238 Conn. at 196, 680 A.2d at 1252, of the fraud claim ordered to arbitration by Lanier I. Consequently, the arbitration panel had subject-matter jurisdiction of that cause of action, and the exception advanced in § 26, Restatement (Second) of Judgments, on which Lanier relies, does not apply.[6]
For these reasons, the judgment of the trial court is reversed and the cause is remanded for disposition consistent with this opinion.
REVERSED AND REMANDED.
HOOPER, C.J., and MADDOX, HOUSTON, COOK, SEE, LYONS, BROWN, JOHNSTONE, and ENGLAND, JJ., concur.
[1] Jordan was "a representative of Old Republic." Lanier I, 644 So.2d at 1259 n. 2.
[2] Of these original defendants, Old Republic is the only defendant involved in this appeal.
[3] The term "expirations" refers to "a list of the agency's customers." (Reporter's Transcript, at 787.) It "includes the names, the expiration dates, the effective dates, the coverages, the limits, the agency files and . . . the right to collect commissions on that business." Id.
[4] In this connection, we hasten to reiterate that the parties' rights to the expirations after termination of the Agreement arose directly under Article X.D. of the Agreement. In other words, Old Republic's interference with the expirations was the breach of contract. Thus, the dispute over the expirations was squarely "within the scope of the submission" ordered by Lanier I. Clearly, the arbitration panel had subject-matter jurisdiction over it. Consequently, the exception in § 26, Restatement (Second) of Judgments, on which Lanier relies, does not apply.
[5] This conclusion is not inconsistent with our disposition of the conversion claim in Lanier I, where — before the evidence was fully developed in arbitration or in litigation as it has been now — we said: "Count three, alleging that Old Republic . . . converted Lanier's clients and client information for [its] own use, `appears to raise issues largely distinct from the central conflict over the interpretation and performance of the [agreements themselves].'" 644 So.2d 1263 (emphasis added). The conversion claim was extinguished by a summary judgment. To the extent the interference-with-expirations claim replaced it, the complaint's statement of the latter claim differed substantially from that of the former. Significantly, the conversion claim made no mention of the expirations, and the expirations claim made no mention of conversion. At any rate, a comparison of the transcript of the arbitration proceedings with the trial transcript leaves no doubt that the expirations claims was based on the same cause of action as the breach-of-contract claim submitted to arbitration.
[6] The inapplicability of § 26 is further attested by the fact that the species of damages awarded by the trial court were fully recoverable in arbitration under the fraud claim. That they were not awarded in arbitration does not relieve Lanier of the operation of the doctrine of res judicata.