[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 509 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 510 
Lee L. Saad Construction Company, Inc. ("Saad Construction"), appeals from summary judgments against it. We affirm in part and reverse in part.
 I. Facts and Procedural History
On October 27, 1997, Saad Construction entered into a contract with the Baldwin County Board of Education ("the Board") for the construction of an addition to the Spanish Fort Elementary School ("the Spanish Fort project"). DPF Architects, P.C. ("DPF"), was identified in the contract as the architect for the project, but DPF was not a party to the contract between Saad Construction and the Board. The Board and DPF had executed a separate contract in August 1997, under which DPF was to serve as the architect for the Spanish Fort project. DPF's contract with the Board provided that DPF would act as the Board's representative regarding the Spanish Fort project. DPF's project architects for the Spanish Fort project were Lee Turberville and Richard Mueller. DPF hired Todd M. Capes and his company, Capes Engineering, Inc., as the structural engineers for the Spanish Fort project and H.M. Yonge Associates, Inc., as the project's electrical engineers.
On March 25, 1999, DPF conducted what was to be a final inspection of the Spanish Fort project. Turberville found a bulge in the lower portion of the eastern wall of the addition. He decided that the remaining work on the job should be stopped, and both Turberville and Mueller ordered Saad Construction to cease all work pending testing on the wall. *Page 511 
According to DPF, the initial testing revealed that the wall was out of plumb. Over Saad Construction's objections, DPF conducted further testing and those additional tests, which included drilling holes in the wall, showed that the reinforcing steel had not been installed within the wall in accordance with the specifications in the construction contract. At DPF's request, Capes reviewed the test results and determined that the wall did not meet building-code requirements and did not comply with the specifications in Saad Construction's contract with the Board. Capes proposed two plans for remedial work on the wall. Turberville asked Saad Construction to fix the wall, implementing one of Capes's proposals. Saad Construction declined to use either of the plans proposed by Capes to perform the remedial work, and instead proposed a third plan. The Board rejected Saad Construction's plan and hired another contractor to complete the remedial work.
In April 1999, the Board sued Saad Construction and one of its suppliers, Jim Boothe Contracting Supply Company ("Boothe Contracting"), seeking a declaratory judgment as to the rights and obligations of the parties under the construction contract and seeking to interplead certain funds it claimed were in dispute between the parties concerning the Spanish Fort project.[1] In its answer to the Board's complaint, Saad Construction demanded a jury trial on all issues for which a jury trial was appropriate. The Board then filed an amended complaint adding claims against Saad Construction relating to Saad Construction's work on another construction project at the Rosinton Elementary School, another school under the Board's supervision ("the Rosinton project"). Shortly thereafter, DPF and Turberville moved to intervene in the Board's action against Saad Construction; the trial court granted their motion.
In its answer to the Board's amended complaint, Saad Construction raised as an affirmative defense that the Board was contractually obligated to submit disputes related to the construction contract to the Alabama Building Commission. Saad Construction's contracts with the Board concerning both the Spanish Fort project and the Rosinton project contained identical paragraphs numbered 44; paragraph 44 stated:
 "Except as hereinabove provided, any dispute, claim or question concerning the meaning of contract documents, or concerning a breach of the contract, shall be submitted to the Director [of the Alabama Building Commission] and his decision shall be final, binding and conclusive on the parties to the contract. He shall have executive [sic] authority to enforce and make effective such decisions or orders as the Contractor fails to carry out promptly."
Pursuant to paragraph 44, Saad Construction also filed a motion to compel arbitration "with respect to any dispute, claim, or question concerning the interpretation or meaning of the contract documents, or concerning a breach of the contract, involving Spanish Fort Elementary School and/or Rosinton Elementary School." *Page 512 
The Board objected to Saad Construction's motion to compel arbitration. In pertinent part, the Board argued:
 "[U]pon provision of the issues Saad desires to arbitrate, it is clear that Saad makes allegations of tort claims. These tort claims of the parties are beyond the scope of the provisions of paragraph 44 and any `arbitration' of this matter pursuant to paragraph 44 will still require the Court to resolve the tort issues between the parties."
(Emphasis original.) In support of its argument, the Board cited decisions of this Court to the effect that a party may be required to submit to arbitration only those issues it has specifically agreed to arbitrate.[2] The Board continued:
 "By its very terms, the language of paragraph 44 only relates to questions concerning the interpretation or meaning of the contract documents or concerning a breach of the contract. The allegations of Saad that the Board has engaged in wrongful conduct and is responsible for the acts of the architect by respondeat superior and is guilty of a trespass and has engaged in `wrongful acts and/or negligence' are all allegations of tortuous [sic] conduct which are not subject to resolution by the Director pursuant to the language of paragraph 44."
The Board attached to its objection to the motion to compel arbitration a letter from the director of the Alabama Building Commission ("the director") dated June 4, 1999, addressing the scope of his decisions as arbitrator. The director stated: "Please understand that I will not hear matters that are being decided in court." The director continued:
 "Based on the correspondence that I am presently receiving from you, it appears that I should clarify the scope of decisions rendered by the Director. The Director does not determine a correct or acceptable remedy to an alleged or proven deficiency, but will determine whether work directed by an owner or design professional is for the account of the contractor or the owner."
On July 26, 1999, Saad Construction filed a supplemental motion to compel arbitration; the motion stated:
 "Saad Construction insists on arbitration of appropriate issues between Saad Construction and the Board in accordance with the appropriate provisions of the Rosinton and Spanish Fort Contracts. Saad Construction has never and does not now consent to arbitration of issues between the contractor, Saad Construction, and the architect, DPF, or any other person who is not a party to the Rosinton and Spanish Fort Contracts' arbitration provisions. There is no contract containing an arbitration provision requiring arbitration between Saad Construction and any person other than the Board, which said contract is applicable to the Rosinton Project and/or the Spanish Fort Project."
The trial court granted Saad Construction's motion to compel arbitration with the Board. Its order stated:
 "The defendant's motion to compel arbitration as provided for in paragraph 44 of the contract is granted to the extent set out in this contract. All proceedings in this court are stayed pending said arbitration."
Before the arbitration hearing, both Saad Construction and the Board *Page 513 
submitted their claims to the director. In its submission to the director, Saad Construction argued:
 "1. [T]he Board authorized and/or ratified the conduct of the Architect who wrongfully seized the building and declared the building to be `structurally unsound.' The conduct of the Board, directly and/or by its Architect constituted a breach of contract. . . .
 "2. [T]he Board, directly and/or through its Architect, conducted a series of destructive tests on the eastern interior walls. . . . These tests were [conducted] after [those] walls had been accepted, without exception. . . . The Board has demanded that Saad pay for the testing. Saad contends that the Board is responsible for the cost of the tests. . . . Saad also claims that the conduct of the Board, directly and/or through its Architect, delayed and prevented Saad from expeditious completion of punch-list items. . . .
 "3. . . . Saad contests the existence of any deficiency meriting remedial work on the subject wall. Saad protested the failure and refusal of the Board to provide information requested concerning the design, engineering and evaluation of the subject wall and information concerning the details of the justification for the demanded remedial action. Saad appealed the Board's demand for remedial work to the Director in accordance with the terms of the contract. Within days of the appeal, the Board insisted that Saad go forward with the remedial work notwithstanding the existence of the appeal. On Thursday June 10, 1999, and acting under protest, Saad acceded to the Board's demand and agreed to go forward with the work beginning Monday, June 14, 1999. On Friday June 12, 1999,[3] the Board gave notice that Saad would not be allowed to do the remedial work and that the Board would move forward using a different contractor, while seeking to collect the cost from Saad. The Board also demanded that Saad surrender the keys to the building to the Board. Saad appealed the Board's decision to the Director on June 13, 1999. . . .
". . . .
 "7. There exists a change order of $14,408.50 for a change of the power connection from overhead to underground. Saad had substantially completed the installation of this overhead power before the Board, through its Architect, demanded that the overhead installation be removed and an underground installation be constructed. Saad contends that the contract documents, when reasonably and properly read, call for overhead power. Saad also contends that the Board, by its conduct and that of its Architect, is estopped to deny the propriety of the overhead installation of the power. . . .
". . . .
 "10. Saad claims the additional general conditions of approximately $125,000 caused by the wrongful acts and/or negligence of the Board, directly and/or through its Architect.
 "11. Saad claims the cost overruns of approximately $250,000 on this Project caused by the wrongful acts and/or negligence of the Board, directly and/or through its Architect.
". . . .
 "14. Saad claims that the conduct of the Board, directly and/or through its Architect, has been such as to cause increased cost in the performance of the *Page 514 
work. The Board has acted and has allowed and/or authorized the Architect to act in violation of the requirements for professional services. The conduct of the Board, directly and/or through its Architect, has been done in such a manner as to impede and prevent Saad from the timely and proper completion of the work. As a result . . . Saad claims that it is excused from responsibility for the delay and other problems, if any there be, and that the Board is liable for breach of contract."
The Board claimed in its submission to the director that Saad Construction had breached the contract.
Saad Construction also submitted to the director an extensive document entitled "Statement of Facts and Position of Contractor," in which Saad Construction elaborated on its claims and responded to the Board's breach-of-contract claim. Saad Construction argued, among other things, that parties other than the Board had committed various wrongful acts and omissions acting on behalf of the Board; therefore, it argued, Saad Construction did not breach the contract. Saad Construction also claimed that neither DPF nor Capes performed the required inspections earlier in the project. Saad Construction also quoted Capes's deposition testimony in which he stated that the out-of-plumb condition of the wall did not necessitate the requested remedial work. Pursuant to an agreement between Saad Construction and the Board, contract issues concerning the Rosinton project were not presented to the director. Before the arbitration hearing, the director prepared an agenda that included all of the claims submitted by Saad Construction and the Board.
The director conducted an arbitration hearing between Saad Construction and the Board on June 27, 28, and 29, 2000. There is no transcript of that arbitration hearing. On July 14, 2000, the director issued his decision, which consisted of a list of the claims made by Saad Construction and the Board with a note beside each claim, "Award" or "No Award." The director did not explain his reasons behind the decision. The director noted "no award" concerning both parties' claims related to the remedial work on the wall. The director made an award for Saad Construction on its claims for the changes to the overhead electrical installations and also made awards to Saad Construction for weather-related delays and for the addition of fire dampers that were also the subject of a dispute between the parties. The director made awards to the Board for remedial work performed by the remedial-work contractor unrelated to the wall, "future remedial work," and liquidated damages under the contract. The director made no award concerning any of Saad Construction's other claims. Both the Board and Saad Construction satisfied the awards.
In September 2000, Saad Construction filed a cross-claim against DPF and Turberville and a third-party complaint against Mueller, Capes, Capes Engineering, Yonge Associates, and Larry Kerr, a former employee of Saad Construction who worked on the Spanish Fort project. In count one, Saad Construction alleged "Breach of Contract, Innocent, Negligent, Wilful, Wanton, and/or Intentional Misrepresentation and Suppression of Material Facts." Specifically, Saad Construction alleged that DPF, Turberville, Mueller, and/or Yonge Associates withheld from Saad Construction information regarding changes ordered by the Alabama Building Commission to the "plans and specifications" for the Spanish Fort project. In count two, Saad Construction alleged that DPF, Turberville, Mueller, and Yonge Associates "knew or should have known *Page 515 
that the written specifications called for overhead electric service installation, while the drawings referred to underground installation of the electric service." Saad Construction alleged that DPF, Turberville, Mueller, and Yonge Associates "acted negligently, wilfully, wantonly, recklessly and/or intentionally by providing incorrect information and/or by representing that an overhead electric service connection was called for and/or permitted in the construction of the Spanish Fort project." In count three, Saad Construction alleged that DPF, Turberville, Mueller, and Yonge Associates knew or should have known that the plans and specifications did not call for fire dampers even though Saad Construction's contract with the Board did call for fire dampers, and that those defendants withheld their knowledge about this discrepancy from Saad Construction. In count four, Saad Construction alleged that DPF, Turberville, Mueller, and Yonge Associates issued a notice to proceed with the Spanish Fort project binding Saad Construction to performance, even though those defendants had failed to secure proper authorization for the project from the City of Spanish Fort.
In count five, Saad Construction alleged that DPF, Turberville, Kerr, Mueller, Capes, and Capes Engineering intentionally interfered with Saad Construction's contractual relationship with the Board. Saad Construction also alleged that these defendants "acted negligently, wantonly, intentionally, and/or maliciously and oppressively" resulting in injury to Saad Construction, and that they engaged in a civil conspiracy against Saad Construction. Saad Construction specifically alleged that Turberville, Mueller, and Kerr "engaged in a scheme to destroy [Saad Construction] and to interfere with its contractual relationship with the Board." Saad Construction alleged that Kerr violated his fiduciary duty as an employee of Saad Construction by furnishing information concerning Saad Construction to DPF, Turberville, and Mueller for purposes contrary to the interest of Saad Construction, and by failing to perform assigned tasks despite reporting to Saad Construction that those tasks had been performed. Saad Construction further alleged that DPF, Turberville, and Mueller used their position as architect for the Spanish Fort project to prevent Saad Construction from properly and timely performing its contract with the Board and to increase the costs of performance. Saad Construction also alleged that DPF, Turberville, and Mueller knowingly "made false, slanderous and defamatory statements about the quality of work performed by Saad" by stating that the addition to the school was unsafe, and that DPF, Turberville, Mueller, Capes, and Capes Engineering continued to assert that the addition was unsafe despite actual knowledge that that claim was not supported. Finally, Saad Construction alleged that DPF, Turberville, Mueller, Capes, Capes Engineering, and Yonge Associates frustrated Saad Construction's efforts to resolve its claims with the Board by making false claims about the project and by creating "false and overstated invoices for the cost of alleged remedial work on the Project."
The trial court dismissed the Board and realigned the parties to identify Saad Construction as the plaintiff and the other remaining parties as defendants. The dismissal of the Board also resulted in the dismissal of Boothe Contracting as a party because the only claims against Boothe Contracting were those alleged by the Board. DPF, Turberville, Mueller, Capes, and Capes Engineering subsequently filed motions for a summary judgment. The trial court entered summary judgments in favor of those parties, stating: "The Court *Page 516 
is of the opinion that all issues are or were covered by arbitration. All motions for summary judgment are granted." Kerr and Yonge 
Associates then filed motions for a summary judgment; the trial court also entered summary judgments in their favor. Saad Construction appeals.
 II. Standard of Review
We review a trial court's ruling on a summary-judgment motion de novo.Verchot v. General Motors Corp., 812 So.2d 296, 299 (Ala. 2001); Busseyv. John Deere Co., 531 So.2d 860, 862 (Ala. 1988). "Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant." Hobson v. American Cast Iron Pipe Co., 690 So.2d 341,344 (Ala. 1997).
 III. Preclusive Effect of the Arbitration Proceeding
Saad Construction argues that the trial court erred in entering the summary judgments for DPF, Turberville, Mueller, Capes, Capes Engineering, Kerr, and Yonge Associates (hereinafter referred to collectively as "the appellees") because none of the appellees were parties to the arbitration proceeding and because the claims made by Saad Construction in the arbitration proceeding are not identical to the claims made by Saad Construction in its action against the appellees.
The appellees argue that the summary judgments in their favor are proper because, they argue, Saad Construction's claims were barred by the doctrines of "collateral estoppel and/or res judicata" because they were decided in the arbitration proceeding.
Both collateral estoppel and res judicata are affirmative defenses; thus, the party raising the defense has the burden of proving each element. Rule 8(c), Ala.R.Civ.P.; Wal-Mart Stores, Inc. v. Smitherman,743 So.2d 442, 448 (Ala. 1999); Ex parte Aratex Servs., Inc.,622 So.2d 367, 368 (Ala. 1993). In Alabama, the "`doctrines of [resjudicata and collateral estoppel] apply as well to awards in arbitration as they do to adjudications in judicial proceedings.'" Old Republic Ins.Co. v. Lanier, 790 So.2d 922, 928 (Ala. 2000) (quoting American Ins. Co.v. Messinger, 43 N.Y.2d 184, 189-90, 371 N.E.2d 798, 801, 401 N.Y.S.2d 36,39 (1977)). See also Ex parte Messer, 797 So.2d 1079, 1085 (Ala. 2001).
 A. Res Judicata Argument
Res judicata and collateral estoppel are two closely related, judicially created doctrines that preclude the relitigation of matters that have been previously adjudicated or, in the case of res judicata, that could have been adjudicated in a prior action.
 "The doctrine of res judicata, while actually embodying two basic concepts, usually refers to what commentators label `claim preclusion,' while collateral estoppel . . . refers to `issue preclusion,' which is a subset of the broader res judicata doctrine."
Little v. Pizza Wagon, Inc., 432 So.2d 1269, 1272 (Ala. 1983) (Jones, J., concurring specially). See also McNeely v. Spry Funeral Home ofAthens, Inc., 724 So.2d 534, 537 n. 1 (Ala.Civ.App. 1998). In Hughes v.Martin, 533 So.2d 188 (Ala. 1988), this Court explained the rationale behind the doctrine of res judicata:
 "Res judicata is a broad, judicially developed doctrine, which rests upon the ground that public policy, and the interest of the litigants alike, mandate that there be an end to litigation; that those who have contested an issue shall be bound by the ruling of the court; and *Page 517 
that issues once tried shall be considered forever settled between those same parties and their privies."
533 So.2d at 190. The elements of res judicata are
 "(1) a prior judgment on the merits, (2) rendered by a court of competent jurisdiction, (3) with substantial identity of the parties, and (4) with the same cause of action presented in both actions."
Equity Res. Mgmt., Inc. v. Vinson, 723 So.2d 634, 636 (Ala. 1998). "If those four elements are present, then any claim that was, or that could have been, adjudicated in the prior action is barred from further litigation." 723 So.2d at 636. Res judicata, therefore, bars a party from asserting in a subsequent action a claim that it has already had an opportunity to litigate in a previous action.
The corollary to the above-stated rationale is that the doctrine of res judicata will not be applied to bar a claim that could not have been brought in a prior action. Old Republic, supra, 790 So.2d at 928. See also United States v. Maxwell, 189 F. Supp.2d 395, 406 (E.D.Va. 2002);Restatement (Second) of Judgments, § 26(1)(c) (1982),[4]Restatement (Second) of Judgments, § 51(1)(a).[5] "In order for a judgment between the same parties to be res judicata, it must, among other things, . . . involve a question that could have been litigated in the former cause or proceeding." Stephenson v. Bird, 168 Ala. 363, 366,53 So. 92, 93 (1910). See also Dekle v. Vann, 284 Ala. 142, 223 So.2d 30
(1969), in which this Court held that a prior judgment in equity ordering the defendants to open a wall adjacent to the plaintiff's land was not res judicata in a subsequent action seeking damages for trespass, because the equity court lacked jurisdiction to award punitive damages.
When deciding whether an arbitrator's award is res judicata as to a subsequent claim, we must also consider whether the claim was within the scope of the submission to the arbitrator. Old Republic,790 So.2d at 929; Restatement (Second) of Judgments, § 26(1)(c); Restatement(Second) of Judgments, § 84, comment d. ("A preliminary question in giving res judicata effect to an arbitration award is whether the claim or issue was within the scope of the reference to arbitration.") Because an arbitrator's jurisdiction is limited to the scope of the submission, claims not within the scope of the submission are not barred by the doctrine of res judicata in a subsequent action. Old Republic,790 So.2d at 929-30; Restatement (Second) of Judgments, *Page 518 
§ 26(1)(c). In Old Republic, we held that a prior arbitration award on claims alleging fraud and breach of contract was res judicata as to two claims against the same defendant for tortious interference with a subagency contract. We held that the plaintiff's tortious-interference claims, albeit labeled differently in the subsequent civil action, arose from the same "nucleus of operative facts" as did the fraud and breach-of-contract claims. 790 So.2d at 933. However, we also held that the tortious-interference claims were "`within the scope of the submission' to arbitration." 790 So.2d at 929 (quoting Fink v.Golenbock, 238 Conn. 183, 196, 680 A.2d 1243, 1252 (1996)). This holding was critical to the result in Old Republic, because had those claims not been "within the scope of the submission," the arbitrator would have lacked subject-matter jurisdiction over those claims and the arbitrator's decision, therefore, would not have been res judicata as to those claims. ("[T]he issue in this case is . . . whether the claims Lanier litigated `were within the scope of the submission' to arbitration."790 So.2d at 929. See also Restatement (Second) of Judgments, § 26(1)(c); Restatement (Second) of Judgments, § 84, comment d.
Saad Construction's tort claims were not within the scope of the submission to arbitration. The trial court ordered arbitration "to the extent set out in [paragraph 44 of the Board/Saad Construction] contract." The arbitration clause provided for arbitration of "any dispute, claim or question concerning the meaning of contract documents, or concerning a breach of the contract." The director explained that in the arbitration proceeding he would "determine whether work directed by an owner or design professional is for the account of the contractor or the owner." It is also instructive that the Board, the other party to the contract containing the arbitration provision at issue, objected to Saad Construction's motion to compel arbitration, arguing that Saad Construction's tort claims "are beyond the scope of the provisions of paragraph 44 and any `arbitration' of this matter pursuant to paragraph 44 will still require the Court to resolve the tort issues between the parties." (Emphasis in Board's objection.)
"A party to a contract can be forced to arbitrate only those issues he or she specifically agrees to submit to arbitration." Ryan WarrantyServs., Inc. v. Welch, 694 So.2d 1271, 1273 (Ala. 1997). Whether the parties agreed to submit certain claims to arbitration requires a determination of the intent of the parties. Id. "General rules of contract interpretation require that the intent of the parties be derived from the words of the contract, unless an ambiguity exists."694 So.2d at 1273. The arbitration clause in Saad Construction's contract with the Board was unambiguously limited to matters concerning interpretation of the contract or a breach of the contract. The limiting language of the arbitration clause did not encompass Saad Construction's tort claims against the appellees; thus, those claims were not within the scope of submission to arbitration. Additionally, the appellees presented no evidence indicating that the director possessed the authority to award Saad Construction all the damages it now seeks. Res judicata will not apply to bar a subsequent action for a remedy that was not available in a prior action. Dekle, supra, 284 Ala. at 144, 223 So.2d at 31; Restatement(Second) of Judgments, § 26(1)(c). Because the director lacked subject-matter jurisdiction over Saad Construction's tort claims and could not award punitive damages, res judicata does not bar Saad Construction from asserting those claims in a subsequent action. Old *Page 519 Republic, 790 So.2d at 929-30; Restatement (Second) of Judgments, § 26.
Moreover, the appellees offered no evidence indicating that Saad Construction could have asserted in the arbitration the claims it now asserts against them. The Board and Saad Construction were the only signatories to the contract containing the arbitration provision, and the Board and Saad Construction were the only parties that actually participated in the arbitration. The arbitration provision explicitly stated that the director's decision "shall be final, binding and conclusive on the parties to the contract." (Emphasis added.) "[T]he doctrine of estoppel operates to prevent a signatory to an arbitration agreement from frustrating arbitration of a related claim against a nonsignatory where the nonsignatory seeks arbitration." Ex parte Tony'sTowing, Inc., 825 So.2d 96, 98 (Ala. 2002).
There is no evidence in the record indicating that DPF, Turberville, Mueller, Capes, Capes Engineering, Yonge Associates, or Kerr sought to join the arbitration or that they were even willing to participate in the arbitration of Saad Construction's claims against them. DPF, Turberville, and Mueller argue that they did not seek to intervene in the arbitration because, they said, Saad Construction had already indicated that it did not intend to arbitrate its claims against them. However, there is no factual basis in the record for the implication by those appellees that, in the absence of Saad Construction's objections, they would have sought to intervene. For all that appears, the Board — a signatory to the arbitration clause — or the arbitrator would have objected to the joinder of any of the appellees in the arbitration.
The appellees had the burden of proving that Saad Construction could have arbitrated its tort claims against them. Rule 8(c), Ala.R.Civ.P.;Smitherman, supra, 743 So.2d at 448. Saad Construction could not have done so without the appellees' cooperation. Because the appellees did not satisfy their burden of proving that Saad Construction could have arbitrated its tort claims against them, res judicata does not apply to bar Saad Construction from subsequently asserting its tort claims against the appellees.
As this Court has previously recognized:
 "`[T]he relevant federal law requires piecemeal resolution when necessary to give effect to an arbitration agreement. Under the Arbitration Act, an arbitration agreement must be enforced notwithstanding the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement.'"
Terminix Int'l Co. v. Jackson, 669 So.2d 893, 897 (Ala. 1995) (quotingMoses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 20 (1983) (footnote omitted; emphasis in Moses H. Cone)). Because we hold that the appellees have not met their burden of proving that Saad Construction could have brought its tort claims against them in the arbitration, we need not determine whether the other elements necessary for the application of res judicata are present.
 B. Collateral Estoppel Argument
Although Saad Construction could not have asserted its tort claims against the appellees before the director, collateral estoppel might still apply to prevent Saad Construction from relitigating factual issues common to its claims against the appellees that have already been determined by the director if the elements of collateral estoppel are satisfied. Abramson v. Pennwood Inv. Corp., 392 F.2d 759, 762 (2d *Page 520 
Cir. 1968); Cream Top Creamery v. Dean Milk Co., 383 F.2d 358, 362-63 (6th Cir. 1967); Restatement (Second) of Judgments, § 26, Reporter's Note to comment c(1).[6] After holding that the doctrine of res judicata did not bar federal claims over which the state court in the prior action lacked jurisdiction, the United States Court of Appeals for the Second Circuit in Abramson further held: "Of course, where both the state and federal suits are based on the same transactions, collateral estoppel would apply with regard to the facts determined in the state action."392 F.2d at 762. Thus, although the prior adjudication in the arbitral forum would not, under the doctrine of res judicata, bar Saad Construction's claims against the appellees, the doctrine of collateral estoppel might nonetheless apply if the requirements for that doctrine are satisfied.
For the doctrine of collateral estoppel to apply, the following elements must be established:
 "`(1) that an issue in a prior action was identical to the issue litigated in the present action; (2) that the issue was actually litigated in the prior action; (3) that resolution of the issue was necessary to the prior judgment; and (4) that the same parties are involved in the two actions.'
 "Smith v. Union Bank Trust Co., 653 So.2d 933, 934 (Ala. 1995). '"Where these elements are present, the parties are barred from relitigating issues actually litigated in a prior [action]."' Smith, 653 So.2d at 934 (quoting Lott v. Toomey, 477 So.2d 316, 319 (Ala. 1985))."
Biles v. Sullivan, 793 So.2d 708, 712 (Ala. 2000). "Only issues actuallydecided in a former action are subject to collateral estoppel." Leveretteex rel. Gilmore v. Leverette, 479 So.2d 1229, 1237 (Ala. 1985) (emphasis added). The burden is on the party asserting collateral estoppel to prove that the issue it is seeking to bar was determined in the prior adjudication. See Adams v. Sanders, 811 So.2d 542, 545 (Ala.Civ.App. 2001) ("Because we have no transcript of the trial in the district court, the burden is on Sanders to show that the district court determined that he was not negligent."). See also United States v. Cala,521 F.2d 605, 608 (2d Cir. 1975) ("The burden . . . is on [the one asserting collateral estoppel] to establish that the issue he seeks to foreclose from litigation in the present prosecution was necessarily decided in his favor by the prior verdict.").
The appellees have not satisfied their burdens of proof as to their affirmative defense of collateral estoppel. As previously noted, one who claims the defense of collateral estoppel must prove, among other things, that the issue was "actually decided," Leverette,479 So.2d at 1237, and "that resolution of the issue was necessary to the prior judgment," Biles, 793 So.2d at 712. Moreover, because we are reviewing a summary judgment, we "must review the *Page 521 
record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant." Hobson, supra, 690 So.2d at 344.
The director did not explain the rationale for his arbitration decisions, and he made no specific findings of fact. Instead, he merely entered the words "Award" or "No Award" next to each of the claims made by Saad Construction and the Board. The mere entries of "No Award" on Saad Construction's claims against the Board, which included allegations of misconduct by the appellees, does not necessitate a finding that the arbitrator resolved against Saad Construction its arguments concerning the appellees' alleged misconduct. The appellees have not met their burden of proving that the arbitrator actually decided that the appellees were not responsible for Saad Construction's damage or "that resolution of the issue was necessary to the prior judgment." Biles,793 So.2d at 712. Because we hold that the appellees did not satisfy their burden of proving that the director actually decided that the appellees did not commit the wrongful acts Saad Construction alleged, we need not consider whether the appellees satisfied their burdens of proof as to the other elements of collateral estoppel.
 C. Satisfaction-of-Judgments Argument
The appellees also argue that the summary judgments should be affirmed because Saad Construction was awarded judgments by the director and those judgments have been satisfied. Although the trial court entered the summary judgments based upon its conclusion that "all issues are or were covered by arbitration," our review is not limited to that reasoning, and we may affirm the summary judgments if they are proper for any reason supported by the record. Smith v. Equifax Servs., Inc., 537 So.2d 463
(Ala. 1988).
"It has long been the law in Alabama that a person can sue any number of parties, obtain a judgment against any one, or several of them, but can gain but one satisfaction." Mobile Ins., Inc. v. Smith, 441 So.2d 894,896 (Ala. 1983). "Once the judgment has been satisfied for a single injury, no other suits by the plaintiff against any tort-feasor are permitted in regard to the same injury." Ex parte Rudolph, 515 So.2d 704,708 (Ala. 1987). Moreover, a judgment awarding damages to an injured person in one proceeding acts as a limitation on the amount of damages that might be recovered in a subsequent proceeding against others responsible for the injury. Restatement (Second) of Judgments, § 51(2)(a). However, if "[t]here were limitations on the competence of the forum in the first action preventing him from obtaining the full measure of his damages, as stated in § 26(1)(c), [Restatement (Second) ofJudgments]," then the injured party may still be entitled to seek those damages unavailable to him in the first action.[7] Id. *Page 522 
In count two of its cross-claim/third-party complaint, Saad Construction alleged that DPF, Mueller, Turberville, and Yonge 
Associates knew or should have known that the written specifications for the Spanish Fort project called for electrical service connections to be installed overhead while the drawings referred to underground installation, but that they nevertheless permitted and/or affirmatively instructed Saad Construction to install the connections overhead. In its submission to the director, Saad Construction argued that DPF permitted Saad Construction to complete the electrical service connections overhead. Saad Construction also argued that Yonge Associates directed Saad Construction's subcontractor to install the electrical service connections overhead. Saad Construction argued that only after the connections were completed did DPF insist that the electrical service connections should be installed underground. Saad Construction argued that "DPF either failed to inspect or concealed its findings about the overhead system. . . ." Saad Construction further argued that either the failure or the concealment was attributable to the Board.
In count three, Saad Construction alleged that DPF, Turberville, Mueller, and Yonge Associates knew or should have known that Saad Construction's contract with the Board required the installation of fire dampers, but that the plans and specifications for the project did not call for fire dampers. Saad Construction further alleged that DPF, Turberville, and Yonge Associates "remained silent and allowed [Saad Construction] to act to its detriment by performing certain construction on the Spanish Fort Project without installing dampers."
On both of those claims, Saad Construction sought "economic damages, including and not limited to, delay in the work, increased overhead, increased cost of performance, interruption of work progress, damage to Saad Construction's reputation, unnecessary disruption of the work of subcontractors and other damages." Saad Construction also sought punitive damages.
In the arbitration, the director awarded Saad Construction $11,211 and a 10-day extension for the completion of the project on its claims related to changes in the electrical service connections. The director also awarded Saad Construction $3,022 and a 14-day extension for the completion of the project on Saad Construction's claims related to the fire dampers. It is uncontroverted that the Board satisfied the director's awards to Saad Construction. However, as the director explained the scope of his decisions:
 "The Director does not determine a correct or acceptable remedy to an alleged or proven deficiency, but will determine whether work directed by an owner or design professional is for the account of the contractor or the owner."
Certain damages were unavailable to Saad Construction in the arbitration. Thus, Saad Construction is not foreclosed from seeking in its subsequent action against the appellees those damages it could not have recovered in the arbitration. Restatement (Second) of Judgments, § 51(2)(a); see also Dekle, supra, 284 Ala. at 144, 223 So.2d at 31. *Page 523 
 IV. Separate Argument of Capes and Capes Engineering
Finally, we address a separate argument made by only Capes and Capes Engineering. In addition to arguing that the trial court should enter a summary judgment in their favor because the arbitration barred Saad Construction's claims, Capes and Capes Engineering also presented to the trial court Capes's sworn affidavit addressing the merits of Saad Construction's claims. In his affidavit, Capes denied that DPF requested that either he or Capes Engineering form any opinions or recommendations concerning the termination of the Board's contract with Saad Construction. Capes also stated that all services he performed were in accordance with the applicable standard of care. Capes denied that he made any false claims concerning the project, created any false or overstated invoices for the cost of the remedial work, or created or approved any false or fraudulent damage claims associated with the Spanish Fort project.
Capes's affidavit was sufficient to shift to Saad Construction the burden to produce substantial evidence in support of its claims against Capes and Capes Engineering. Anderson v. Alabama Reference Labs.,778 So.2d 806, 811 (Ala. 2000). Saad Construction presented no evidence creating a genuine issue of material fact concerning its claims against Capes or Capes Engineering. "In opposing a motion for summary judgment, the nonmovants cannot merely rely on the allegations in their complaint."Rhodes v. General Motors Corp., 621 So.2d 945, 949 (Ala. 1993). Thus, Capes and Capes Engineering were entitled to a summary judgment. Smith,537 So.2d at 463.
 V. Conclusion
We affirm the summary judgments in favor of Capes and Capes Engineering, but reverse the summary judgments in favor of DPF, Turberville, Mueller, Yonge Associates, and Kerr, and we remand the case for further proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
Moore, C.J., and Houston, See, Brown, Johnstone, Harwood, Woodall, and Stuart, JJ., concur.
[1] In March 1999, Saad Construction sued the Board, DPF, Turberville, and Mueller in the Mobile Circuit Court alleging breach of contract and intentional interference with the contract. Saad Construction also sought a temporary restraining order or an injunction mandating the return of the Spanish Fort project to it and ordering the Board, DPF, Turberville, and Mueller to stop interfering with Saad Construction's performance under its contract with the Board. Saad Construction voluntarily dismissed that action pursuant to Rule 41, Ala.R.Civ.P., on May 13, 1999.
[2] The Board cited Ryan Warranty Services, Inc. v. Welch, 694 So.2d 1271
(Ala. 1997); Allied-Bruce Terminix Cos. v. Dobson, 684 So.2d 102 (Ala. 1995); and Old Republic Insurance Co. v. Lanier, 644 So.2d 1258, 1261
(Ala. 1994).
[3] June 12, 1999, was a Saturday, not a Friday. However, whether that date was a Friday or a Saturday is not material to our decision in this case.
[4] Section 26(1)(c) of the Restatement (Second) of Judgments states:
 "(1) When any of the following circumstances exists, the general rule of § 24 does not apply to extinguish the claim, and part or all of the claim subsists as a possible basis for a second action by the plaintiff against the defendant:
". . . .
 "(c) The plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy or form of relief in the first action because of the limitations on the subject matter jurisdiction of the courts or restrictions on their authority to entertain multiple theories or demands for multiple remedies or forms of relief in a single action, and the plaintiff desires in the second action to rely on that theory or to seek that remedy or form of relief."
[5] Section 51(1)(a) of the Restatement (Second) of Judgments states:
 "(1) A judgment against the injured person that bars him from reasserting his claim against the defendant in the first action extinguishes any claim he has against the other person responsible for the conduct unless:
 "(a) The claim asserted in the second action is based upon grounds that could not have been asserted against the defendant in the first action."
[6] The reporter's note to comment c(1) of § 26 states:
 "When the plaintiff, after having lost a state action, seeks relief with respect to the same transaction under a federal statute enforceable only in federal court, it may be argued that he should be held barred especially if he could have instituted his original suit in federal court where both federal and state grounds could have been considered. . . . It appears sounder, however, not to preclude the federal action by the doctrine of bar, but rather to allow a carry-over decided issue from the state to the federal action by way of issue preclusion. . . ."
(Emphasis added.) In other words, although res judicata does not barclaims over which the first court lacked jurisdiction, the first court's decisions on issues common to those before the second court may be "carried over" and given binding effect in the second court by the application of the doctrine of collateral estoppel.
[7] The comments to Restatement (Second) of Judgments, § 51, include the following discussion:
 "d. Preclusion as to amount of damages (Subsection (2)). A judgment for the injured person, even though favorable to him on the question of liability, is adverse to him insofar as it determines that his damages did not exceed those awarded. It is therefore ordinarily conclusive as a ceiling on the damages that may be recovered in the second action. However, there are circumstances in which he would be able to maintain a claim for addition damages against the original defendant. See § 26(1)(c). . . . When those circumstances exist, his first recovery should not limit the damages he may recover in an action against the other obligor. . . ."
The Restatement then provides the following illustration:
 "7. P is injured as the result of the deliberate act of S, who is M's employee. P brings an action against M, the applicable law limiting his recovery to compensatory damages. P obtains judgment for $10,000. In a subsequent action against S, P may obtain judgment for no more than $10,000 in compensatory damages but is not precluded from recovering punitive damages."