940 So.2d 269 (2006)
ERNST & YOUNG, LLP
v.
Wade TUCKER, derivatively, for the benefit of and on behalf of HealthSouth Corporation.
HealthSouth Corporation
v.
Wade Tucker, derivatively, for the benefit of and on behalf of HealthSouth Corporation.
HealthSouth Corporation
v.
Ernst & Young, LLP.
1040643, 1040689 and 1041367.
Supreme Court of Alabama.
April 7, 2006.
*270 Henry E. Simpson, Elizabeth R. Floyd, and Kate Thornton of Adams & Reese/Lange Simpson LLP, Birmingham; and Steven M. Farina of Williams & Connolly, LLP, Washington, D.C., for Ernst & Young, LLP.
John W. Haley, Ralph D. Cook, and Bruce J. McKee of Hare, Wynn, Newell & Newton, Birmingham; John Q. Somerville of Galloway & Somerville, Birmingham; and Frank P. DiPrima, Covent Station, New Jersey, for Wade Tucker.
Julia Boaz Cooper and Marc James Ayers of Bradley Arant Rose & White, LLP, Birmingham; Scott Burnett Smith of Bradley Arant Rose & White, LLP, Huntsville; and Peyton D. Bibb, Jr., and Michael K.K. Choy of Haskell Slaughter Young & Rediker, L.L.C., Birmingham, for HealthSouth Corporation.
HARWOOD, Justice.
These appeals began as a shareholder-derivative action brought by Wade Tucker in August 2002. Tucker asserted contractual and tort claims against various officers and directors of HealthSouth Corporation and various business entities that had had dealings with HealthSouth.[1] In *271 March 2003, Tucker's second amended complaint in this case added as a defendant HealthSouth's former auditor, Ernst & Young, LLP ("E & Y"). Tucker asserted that E & Y's failure to discover multiple instances of wrongdoing by various corporate officers employed by HealthSouth constituted breaches of its employment agreements with HealthSouth and supported Tucker's claims against it of negligence, wantonness, and fraud. Tucker also alleged numerous instances of wrongdoing by various individual managers and members of the board of directors of HealthSouth, including fraud, self-dealing, insider trading, and breaches of fiduciary responsibility. He seeks recovery for the damage resulting from that alleged wrongdoing.
E & Y responded on May 22, 2003, by filing a motion to compel arbitration pursuant to an arbitration agreement indisputably established by its engagement letters with HealthSouth.[2] The arbitration provision included in those letters states:
"Any controversy or claim arising out of or relating to the services covered by this letter or hereafter provided by us to [HealthSouth] (including any such matter involving any parent, subsidiary, affiliate, successor in interest, or agent of [HealthSouth] or of E & Y LLP) shall be submitted first to voluntary mediation, and if mediation is not successful, then to binding arbitration, in accordance with the dispute resolution procedures set forth in the attachment to this letter. Judgment on any arbitration award may be entered in any court having proper jurisdiction."
In addition to including the above provision, the engagement letters refer to an attachment entitled "Dispute Resolution Procedures." In pertinent part, that attachment states:
"The arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the [American Arbitration Association] Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures.
"The arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or in any other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction."
*272 As an alternative to its motion to compel arbitration, E & Y also filed a motion to dismiss Tucker's claims against E & Y because he "has failed to comply with Rule 23.1 of the Alabama Rules of Civil Procedure by failing to make a demand upon the board of directors in control of HealthSouth Corporation prior to the filing of this action against [E & Y]." The trial court on December 29, 2004, issued an order referring Tucker's claims against E & Y to arbitration.
Tucker has conceded that his claims against E & Y are subject to arbitration. However, both E & Y and HealthSouth appeal from the trial court's order referring the case to arbitration, arguing that the order purportedly permits the trial court to retain jurisdiction over issues that they say are subject to arbitration under the agreement. This Court has consolidated those appeals (case no. 1040643 and case no. 1040689) and a third appeal by HealthSouth (case no. 1041367) for purposes of issuing one opinion.
The trial court's December 29, 2004, order states, in pertinent part:
"WHEREAS, E & Y has contended that the claims asserted by Plaintiff Tucker must be arbitrated in compliance with the arbitration provisions of the engagement contracts between HealthSouth, on whose behalf Plaintiff Tucker maintains this action, and E & Y;
"WHEREAS, the Court has determined that Plaintiff Tucker has standing to maintain the derivative claims in this action and, together with his counsel, has the power and authority to make all strategic and tactical decisions with respect to the prosecution of the claims against E & Y, subject in the event of settlement to the approval of the Court;1
"WHEREAS, this Court has entered various orders relating to the management of this case, including an order appointing lead counsel, an order ruling that demand is excused as to all claims and all defendants (including but not limited to E & Y) under Alabama Rule of [Civil Procedure] 23.1, and an order denying the motion by HealthSouth to realign and substitute for Tucker's counsel.
"NOW, THEREFORE, IT IS HEREBY ORDERED as follows:
"1. The claims against E & Y stated in the Third and Fourth Amended Complaints herein are hereby referred to arbitration, and the claims against E & Y are hereby stayed pending arbitration. Plaintiff Tucker and E & Y are hereby directed to proceed expeditiously to the arbitration of those claims.
"2. Referral to arbitration hereunder relates solely to the substance of [Tucker's] claims, i.e., determination of liability and damages and other relief, but does not extend to matters which are within the province and jurisdiction of this Court, including the determination of the issues of demand under Rule 23.1 and choice of derivative counsel to prosecute the case, which issues shall not be re-litigated in arbitration.
"3. This Court hereby retains jurisdiction to (a) enforce the arbitration award, (b) rule on the fairness of any settlement under Alabama [Rule of Civil Procedure] 23.1; (c) enforce any settlement agreement; and (d) award attorneys fees should Plaintiff Tucker obtain a recovery for HealthSouth in connection with the arbitration.
"1 At oral argument E & Y raised the issue of whether Tucker was a stockholder when this derivative action was filed and whether Tucker is a present stockholder. No evidence concerning Tucker's status as a stockholder of *273 HealthSouth at any time relevant hereto has been presented to this Court and no decision has been made by this Court as to this precise issue. This Court has decided that Tucker, and not HealthSouth, is the proper party to pursue the derivative claims against E & Y and that these claims are due to be submitted to arbitration."
On appeal, E & Y and HealthSouth contest the trial court's authority, under the circumstances of this case, to retain jurisdiction over the matters expressed in paragraphs 2 and 3 of its order referring Tucker's claims against E & Y to arbitration.
As previously noted, the allegations of wrongdoing by the management of HealthSouth and E & Y have given rise to a number of other lawsuits, and a review of those other derivative suits is helpful for an understanding of the cases before us. Vice Chancellor Strine in the Delaware Court of Chancery summarized the essential nature of these various lawsuits in an unpublished memorandum opinion in Teachers' Retirement System of Louisiana v. Scrushy, Civ.A. 20529, March 2, 2004 (Del. Ch.2004)(not reported in A.2d). Teachers' Retirement, another shareholder-derivative lawsuit asserting similar claims, was filed against HealthSouth approximately one year after the instant action was filed by Tucker. In discussing whether it was appropriate to stay the proceedings in Teachers' Retirement in light of the pending litigation in Tucker, the Delaware Chancery Court stated:
"As discussed in prior opinions of this and other courts, public scrutiny of HealthSouth's financial integrity first became intense in the summer of 2002. At that time, HealthSouth announced that a new policy regarding reimbursement issued by the federal Centers for Medicare and Medicaid Services (the `CMS Policy') would have a large, detrimental effect on the company's revenues. Put simply, many stockholders and their attorneyswere deeply suspicious about HealthSouth's announcement, given that the CMS Policy had, according to them, been expected for some time. In particular, they suspected that HealthSouth insidersmany of whom had engaged in large transactions involving sales of HealthSouth stock earlier that yearhad concealed the effect of the CMS Policy in order to keep HealthSouth's stock price artificially high.
"The expected two types of filings were soon made. Less relevant here was the spate of federal securities suits filed on August 28, 2002 alleging violations of Sections 10(b) and 20(b) of the Securities Exchange Act. For ease of reference, I call these the `Federal Securities Actions.'
"The second and more relevant kind of case was also filed. On August 28, 2002, the first of several derivative actions was filed in the state courts of Alabama (the `Alabama Derivative Actions'). The first complaint, the `Tucker Complaint,' challenged a wide array of transactions entered into by HealthSouth insiders over the course of several years. Many of these transactions eventually also became the subject of the Teachers' Complaint [the initial complaint filed in Teachers' Retirement]. As a last minute add-on, the Tucker Complaint also briefly challenged certain conduct relating to the CMS Policy; namely, the Tucker Complaint alleged that HealthSouth's then-CEO, Richard Scrushy, had sold a large block of stock back to the company shortly before HealthSouth disclosed the adverse impact of the CMS Policy. As this court noted in an earlier opinion, the original Tucker Complaint was hardly a model of *274 good pleading practice.1 It barely addressed the need to plead demand excusal, a major problem in a derivative case. Moreover, many of the counts in the Tucker Complaint were alleged against placeholder defendants, who were named as fictitious defendants, but who were not identified.
"On September 13, 2002 and October 8, 2002, two additional derivative actions were filed in this court (the `Delaware Derivative Actions'). The Delaware Derivative Actions were focused more narrowly than the Alabama Derivative Actions, centering primarily on recouping improper trading and contract profits HealthSouth insiders had allegedly reaped while HealthSouth was inflating its results by not disclosing more promptly the adverse effects of the CMS Policy. Unlike the Tucker Complaint, which is the key complaint in the Alabama Derivative Actions, the complaints in the Delaware Derivative Actions also asserted that HealthSouth insiders other than Scrushy had sold HealthSouth stock into a market inflated by its ignorance of the effect of the CMS Policy on HealthSouth. In comparison to the Tucker Complaint, the complaints in the Delaware Derivative Actions reflected, as a prior opinion of this court indicates, much greater research and a proper understanding of the need to plead demand excusal.
"On October 18, 2002, the first of two derivative suits was filed in the United States District Court for the Northern District of Alabama (those and later suits filed in that court being referred to here[in]after as the `Federal Derivative Actions'). The claims in the Federal Derivative Actions overlapped with claims already asserted in the Alabama and Delaware Derivative Actions with immaterial exceptions.
"1 See Biondi v. Scrushy, 820 A.2d 1148, 1153-54 (Del.Ch.2003)."
(Additional footnote omitted.)
For the sake of consistency and convenience, we will use the Delaware Court's characterizations to refer to these groups of lawsuits: the Alabama Derivative Actions (commenced by the filing of the Tucker complaint); the Delaware Derivative Actions; and the Federal Derivative Actions. The case generated by the Tucker complaint is the case presently before us. With respect to the further development of the claims in the Tucker complaint, the court in Teachers' Retirement noted:
"[T]his court was sensitive to the eventual need to sort out where the fiduciary duty claims, and claims related to those claims, would ultimately be litigated. To that end, this court, among other efforts towards this end, encouraged counsel in the Delaware Derivative Actions to engage in discussions with their colleagues in the Alabama and Federal Derivative Actions with the hope that they could agree on a division of labor and of forums that would make sense.
"At the same time, Judge Karen O. Bowdre of the U.S. District Court for the Northern District of Alabama was also urging efficiency and cooperation among counsel in the various actions. Among other efforts to rationalize the process, Judge Bowdre appointed a steering committee comprised of representatives of counsel from the various actions, including representatives of the Federal Derivative Actions. The federal committee was responsible for coordinating discovery in all the actions involving stockholders of HealthSouth from 1998 until 2002 that were then pending in her court. Importantly, this federal committee was also charged with coordinating *275 discovery with a committee to be appointed by Judge Allwin E. Horn III, the Alabama Circuit Court Judge who was handling the Alabama Derivative Actions. On August 24, 2003, Judge Horn appointed the state committee, which included . . . counsel from the Alabama Derivative Actions.
"By this time, several notable developments had already occurred. In Alabama state court, the Tucker Complaint, as amended, became the focal point of the Alabama Derivative Actions. Several other cases were `abated' in favor of the Tucker Complaint, the functional equivalent of consolidation.
"The encouragement to counsel in the Delaware, Alabama and Federal Derivative Actions from all the affected courts eventually paid off. In orders entered by Judge Horn, Judge Bowdre, and me, the following division of labor was agreed upon by the then-existing derivative plaintiffs: 1) the Federal Derivative Actions would be stayed in favor of the Alabama Derivative Actions and the Delaware Derivative Actions; 2) the plaintiffs in the Delaware Derivative Actions would prosecute claims relating to Scrushy's sale of HealthSouth stock back to the company in summer 2000 (the so-called `Buyback') in this court; and 3) the remainder of the derivative claims would be prosecuted before Judge Horn in the Alabama Derivative Actions under the aegis of the Tucker Complaint. By this time, the counsel in the Delaware Derivative Actions were participating and conferring with counsel in the Alabama Derivative Actions and developing joint plans for prosecution of all the derivative claims. To that end, the Tucker Complaint was amended a third time in August 2003 to add yet more claims. By this time, the Tucker Complaint covered all the claims raised in the Delaware Derivative Actions and purported to state a wide variety of other claims that are largely co-extensive with the claims raised in the [original complaint filed in Teachers' Retirement].
"Furthermore, Judges Bowdre and Horn had already personally worked together to bring the parties to the various actions together for confidential settlement discussions. They also worked together to coordinate the timing and scope of discovery . . . and the desirability of avoiding duplicative discovery that could tax HealthSouth's already strained resources. By autumn 2003, each Judge had put in place an order identifying lead counsel in the actions pending before them, and their appointees continued to work together on the discovery steering committees they [had] previously established. In December 2003, Judge Horn denied a motion by counsel for another derivative plaintiff to be appointed to the HealthSouth steering committee, finding that `it is in the best interests of all parties to this action to continue forward with the current plan and method of administering and handling this complex litigation.'"
(Footnotes omitted.) The court in Teachers' Retirement concluded that the Delaware Derivative Actions were correctly stayed while the Tucker complaintthe case now before this Courtwas prosecuted.
With respect to the particular procedural history of this case, the issues that are before us in this appeal had their genesis with E & Y's motion seeking to compel arbitration of Tucker's claims against it. That motion to compel also sought, in the alternative, a dismissal of the case on the basis that Tucker had allegedly failed to make a demand upon the board of directors of HealthSouth in compliance with *276 Rule 23.1, Ala.R.Civ.P.,[3] or on the basis that Tucker's claims were duplicative of the claims that were pending in the Federal Derivative Actions.[4]
Tucker then filed a motion for an expedited determination of the "demand" issue, and the trial court conducted a hearing at which that issue, along with several others, was considered. As a result of the arguments and presentations in that hearing, the trial court entered an order on May 10, 2004, stating, among other things:
"The Defendant E & Y has filed a motion to refer to arbitration [Tucker's derivative claims made on behalf of HealthSouth], or in the alternative, to dismiss. Plaintiff Tucker concedes that referral of his complaint against E & Y to arbitration is appropriate. However, nominal Defendant HealthSouth reserves the right to intervene in such claim and prosecute said claim and HealthSouth does not concede arbitrability at this time."
The trial court's order also scheduled briefing and hearings for consideration of the demand issue and a determination as to whether Tucker was the proper party to pursue the claims.
In the ensuing litigation, the issues of Tucker's responsibility to make a demand for relief from HealthSouth and whether he was the proper party to pursue the claims was briefed and argued in detail by all the parties. In its answer filed May 28, 2004, HealthSouth stated that it would remain neutral on the demand issue and stated that it would not seek to dismiss Tucker's claims on that ground under Rule 23.1, Ala. R. Civ. P. However, on July 16, 2004, HealthSouth injected a new issue into the litigation by filing a motion for "Realignment, For Leave To Intervene as Named Plaintiff and Real Party in Interest, For Leave to Serve Amended Complaint, to Sever, and For Other Relief" (hereinafter referred to as HealthSouth's "motion to realign"), essentially asking the trial court to realign it in the litigation as the real party in interest, so as to substitute HealthSouth for Tucker as the plaintiff in control of prosecuting the claims against E & Y. HealthSouth stated that its board of directors had formed a special committee in April 2003 made up of members other than Chairman of the Board and Chief Executive Officer Richard *277 Scrushy and Chief Financial Officer William Owens to operate the company during the litigation.
In a proposed amended complaint HealthSouth offered in conjunction with its motion to realign, HealthSouth asserted some of the same claims made by Tucker, stating, among other things, that its "Board of Directors, Audit Committee and shareholders were unable to discover the fraudulent scheme before March 2003 despite the exercise of due care by the Board members and Audit Committee" because of the alleged fraud of Richard Scrushy and various other HealthSouth managers and the failure of E & Y to conduct its audits in accordance with professional standards. Thus, HealthSouth asserted, it was the "proper party in interest" and it should assume control of the claims against E & Y.
For its part, E & Y had informed the trial court by letter dated May 26, 2004, that it would address both the demand and proper-party-in-interest issues in a subsequent brief, and on July 16, 2004, it presented a brief arguing that it was entitled to an order dismissing Tucker's claims against it both on the ground that Tucker had failed to make a demand on HealthSouth and on the ground that Tucker was not the proper party to assert the claims on behalf of HealthSouth.
Thus, Tucker was required to respond both to the "demand" issue and to HealthSouth's attempt to substitute itself as the proper party in interest. The record shows that Tucker presented numerous and detailed arguments in briefs, all referencing factual allegations and documentation, to respond to these issues. In addition to his arguments on the demand issue, Tucker's briefs included arguments that allowing HealthSouth to obtain control of the claims would put applicable insurance coverage at risk; that HealthSouth's proposed amended complaint improperly excused wrongful conduct by its managers and board of directors; that permitting control of the prosecution of the claims by HealthSouth would result in conflicts between efforts by HealthSouth to protect its board of directors from liability and efforts to recover damages based on the alleged wrongdoing; that HealthSouth and E & Y were judicially estopped from contending that Tucker was not a proper party to prosecute the claims when they had asserted in Teachers' Retirement, supra, that he was a proper party; and that the Delaware courts in Teachers' Retirement and Biondi v. Scrushy, 820 A.2d 1148 (Del.Ch. 2003), had already recognized him as a proper party to prosecute the claims.
After a full hearing on the issues, the trial court entered two separate orders on July 29, 2004: an order denying HealthSouth's motion to realign and an order denying the motions to dismiss based on the demand issues. Both orders noted the extensive arguments presented by the parties, with the order denying the motions to dismiss noting nine different groups of document submissions from the various participants, including Tucker's brief and documentation in support of his contentions; the order denying HealthSouth's motion to realign simply noted the extensive briefs and documentary submissions of HealthSouth and Tucker. In its order denying the motions to dismiss, the trial court noted that it had considered the decisions of the Delaware Chancery Court in Biondi and also Teachers' Retirement, and also stated, in pertinent part:
"(2) based on [HealthSouth]'s pleading of neutrality on the demand issue in its Answer, demand is excused as a matter of law as to all defendants herein under the principle of Kaplan v. Peat, Marwick, Mitchell & Co., 540 A.2d 726 (Del.1988).

*278 "(3) as a separate and independent reason for the said denial with prejudice, Tucker's Amended Complaints adequately plead that the following directors were independence impaired and/or not disinterestedDirectors Scrushy, Owens, Striplin, Gordon, Chamberlin, Newhall, Givins, Watkins, May and Hanson, and thus demand is excused as to all claims pled to date against all defendants. . . . "
The trial court's order on the demand issue also permitted E & Y the opportunity to submit additional nonredundant briefs arguing for a dismissal on any issues relating to demand that had not previously been argued. E & Y did not submit any further briefs.
In its order denying HealthSouth's motion to realign, the trial court stated:
"NOW THEREFORE, having considered all submissions made in connection with the simultaneous briefing, the Motion, the written positions presented by the parties and all authorities cited therein, the oral arguments in the Motion on the afternoon of July 26, 2004, and oral arguments in the related hearing [regarding the demand issue] on the morning of July 26, 2004, it is ORDERED
"1. THAT [HealthSouth's] motion to realign and substitute for derivative plaintiff Tucker as to defendant[ ] . . . is DENIED."
Subsequently, the parties presented further arguments on additional issues concerning motions to dismiss filed by E & Y, and the trial court also requested a form order from the parties on the referral to arbitration of the claims against E & Y. On November 1, 2004, E & Y asserted in a letter to the trial court that the issues of demand and proper party in interest were for consideration by the arbitration panel. Tucker and E & Y were unable to agree on a form order for arbitration of the claims, and each submitted its own proposed form order for referral of the claims to arbitration. On November 9, 2004, the day before E & Y's remaining motions to dismiss were to be argued, HealthSouth submitted a letter to the trial court, which stated, in pertinent part:
"HEALTHSOUTH does not object to the referral of the claims against E & Y to arbitration. HEALTHSOUTH reserves the right, however, to assert any and all rights which the Corporation or its Board of Directors has, or may in the future have, to ensure the vigorous prosecution of the Corporation's claims against E & Y, including the right to seek in the appropriate forum joint or exclusive control of the claims against E & Y based on the development of new or additional material facts or as may otherwise be necessary to protect the interests of the Corporation and its shareholders.
"While [HEALTHSOUTH does] not believe that [Tucker's] proposed [form] order is inconsistent with these reservations, if it is deemed to be inconsistent, HEALTHSOUTH objects to [Tucker's] letter and proposed order to that extent."
HealthSouth did not present an argument at the hearings conducted the next day on the remaining motions to dismiss and the form of the referral to arbitration. Thereafter, the trial court issued its December 29, 2004, order in which it determined that Tucker had standing to assert the claims against E & Y and referred the case to arbitration, reserving jurisdiction over the demand and proper-party-in-interest issues so that the arbitration would not extend to a redetermination of those issues and reserving jurisdiction to address issues arising after the arbitration had occurred. Both HealthSouth and E & Y *279 appealed that order and sought from the trial court a stay of further proceedings (case no. 1040643 and case no. 1040689). On March 31, 2005, the trial court issued an order denying the stay. In pertinent part, that order states:
"This Court makes the following findings of fact:
"1. E & Y willingly and knowingly joined issue on and litigated, the issues of (a) demand under [Alabama] Rules [of Civil Procedure] 23.1 and (b) the proper party plaintiff to prosecute the claims against E & Y. [HealthSouth] similarly litigated the issue of the proper party plaintiff to prosecute the case and did not contest Tucker's claim of demand excusal. [HealthSouth] and E & Y lost both of those issues, as reflected in this Court's two orders of July 29, 2004. Neither E & Y nor HealthSouth appealed either of these orders of July 29, 2004."
Under a section entitled "Conclusions of Law," the same order also states:
"[4](a) E & Y litigated before this Court and lost the very two issues it now wants to litigate before the arbitrators, demand under Rule 23.1[, Ala. R. Civ. P.,] and the proper party to control the case against E & Y. HealthSouth litigated and lost the issue of the proper party to control the case, and conceded the issue of demand in its answer. Kaplan [v. Peat, Marwick, Mitchell & Co., 540 A.2d 726 (Del.1988)]."
"(b) This Court's two orders of July 29, 2004, were never appealed and are the law of the case.
"(c) There is no issue of arbitrability of enforcement of an arbitration award, as that is for the court after the arbitration is complete, and the arbitration agreement specifically contemplates this.
"(d) Similarly, approval of a settlement is for the Court under Rule 23.1, and if there is a settlement, at that stage there is no dispute to arbitrate.
"(e) Finally, award of a fee out of any arbitration award collected, i.e., out of a fund in court, necessarily takes place after the arbitration is complete. As it is not tacked on to any award but comes out of the award, it is none of E & Y's concern."
(Emphasis by the trial court.) E & Y and HealthSouth subsequently petitioned this Court for a stay of the proceedings in the trial court in case no. CV-02-5212, and on April 7, 2005, this Court granted that request.
While the proceedings concerning E & Y and HealthSouth's requests for a stay were pending in the trial court, E & Y filed on March 18, 2005, a separate action (CV-05-1618) against HealthSouth, stating that the purpose of that action was to toll the statute of limitations so that E & Y's claims against HealthSouth could be pursued in arbitration. Those claims alleged that HealthSouth, acting through various managers and members of its board of directors, provided E & Y with fraudulent documents in order to further a scheme of falsely inflating the value of HealthSouth stock. Contemporaneously with the filing of the action, E & Y filed a motion to refer the claims to arbitration.
HealthSouth answered E & Y's complaint and filed a counterclaim, which is substantially identical to the proposed amended complaint it presented with its motion to realign in Tucker's action. The claims asserted in HealthSouth's counterclaim are also substantially similar to the claims asserted by Tucker in his derivative action against E & Y. In response to E & Y's action and motion to compel arbitration, HealthSouth filed its own motion consenting to arbitration and seeking referral of its counterclaim to arbitration. The *280 trial court issued an order that consolidated E & Y's action with the claims already asserted under the Tucker complaint and granted E & Y's motion to compel arbitration. In pertinent part, the trial court's order stated:
"This case is another in the litany of cases dealing with HealthSouth Corporation. First, as a housekeeping measure, as has been done with other HealthSouth-related litigation to facilitate the efficient and economical handling and prosecution of HealthSouth cases, the Court hereby consolidates this case with Wade Tucker, et al. v. Scrushy, et al., CV 02-5212, also pending in the Circuit Court of Jefferson County, Alabama. Any further filings or claims for relief in this matter that are made before this Court shall be made in Tucker, as consolidated.
"On March 18, 2005, E & Y filed this suit for the stated purpose of protecting claims from being barred by the statute of limitation while acknowledging in its Complaint that its claims should and would be pursued in arbitration (`This Complaint is filed for the purpose of tolling any applicable statute of limitations, so that [E & Y's] claims against HealthSouth may be pursued in arbitration. . . .'). E & Y Complaint, at page 1. E & Y's Complaint notes that `[t]o that end, also filed with this Complaint is [E & Y's] Motion to Refer to Arbitration.' Id.
"Based upon E & Y's Complaint and the Motion to Refer to Arbitration, both of which acknowledge expressly that E & Y intended to prosecute its claims in arbitration, the Motion to Refer to Arbitration is hereby GRANTED."
"The parties are directed to proceed forward with arbitration as required by law and all rules and regulations of the applicable Arbitration Association."
HealthSouth filed a motion seeking clarification of this order, specifically seeking a determination from the trial court as to whether its December 29, 2004, order, referring Tucker's claims against E & Y to arbitration would prevent HealthSouth from directly asserting in the arbitration the claims and defenses raised in its counterclaim in case no. CV-05-1618. The trial court denied HealthSouth's motion, and HealthSouth appealed. That appeal (case no. 1041367) was consolidated with the appeals of the other Tucker claims (cases no. 1040643 and no. 1040689) for purposes of issuing one opinion.
Both HealthSouth and E & Y argue that the trial court's order referring these cases to arbitration improperly reserves jurisdiction over matters that are, under the terms of the arbitration agreement, specifically within the authority of the arbitrators. Our review of questions of arbitrability is subject to the standard articulated by the United States Supreme Court in First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). This Court discussed that case in detail in Commercial Credit Corp. v. Leggett, 744 So.2d 890, 892 (Ala.1999). After an extensive discussion of the facts in First Options and the legal precedent stemming from that case, this Court in Leggett listed the following cases and summaries of their holdings on the review of questions of arbitrability:
"See also Dean Witter Reynolds, Inc. v. Fleury, 138 F.3d 1339, 1342-43 (11th Cir.1998) (`Under the Supreme Court's decision in First Options of Chicago, Inc. v. Kaplan, courts, not arbitrators, should decide questions of arbitrability unless there is "clear and unmistakable evidence" that the parties intended to submit such questions to an arbitrator'); PaineWebber Inc. v. Elahi, 87 F.3d 589, 595 (1st Cir.1996) (`the presumption established *281 in [AT & T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986)], and First Optionsthat courts, not arbitrators, decide "arbitrability" unless the parties clearly intend otherwiseis an exception to the "liberal federal policy favoring arbitration"'); Investment Management & Research, Inc. v. Hamilton, 727 So.2d 71 (Ala.1999) (discussing and analyzing First Options)."
744 So.2d at 893. In Polaris Sales, Inc. v. Heritage Imports, Inc., 879 So.2d 1129, 1133 (Ala.2003), this Court further discussed what constitutes questions of arbitrability:
"Questions of arbitrability include those relating to the scope, interpretation, and application of the arbitration agreement, Jim Burke Auto., Inc. v. McGrue, 826 So.2d 122, 132 (Ala.2002), as well as the issue whether a party has waived its right to demand arbitration by `substantially invok[ing] the litigation process.' Hales v. ProEquities, Inc., 885 So.2d 100, 104 (Ala.2003). `A trial court should not order arbitration of the issue of arbitrability except upon "`clea[r] and unmistakabl[e]' evidence" that the parties agreed to arbitrate that issue.' Jim Burke Auto., 826 So.2d at 132 (quoting Commercial Credit Corp. v. Leggett, 744 So.2d 890, 892 (Ala.1999), quoting in turn First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995))."
Thus, a critical consideration in determining arbitrability is whether, under the circumstances of this case, there is clear and unmistakable evidence that the parties intended to submit the questions at issue to arbitration. Moreover, our review of arbitrability, a question of law, is de novo. "[T]he standard of review of a trial court's ruling on a motion to compel arbitration at the instance of either party is a de novo determination of whether the trial judge erred on a factual or legal issue to the substantial prejudice of the party seeking review." Ex parte Roberson, 749 So.2d 441, 446 (Ala.1999). See also Blue Cross Blue Shield of Alabama v. Rigas, 923 So.2d 1077 (Ala.2005); and Hales v. ProEquities, Inc., 885 So.2d 100, 104 (Ala.2003).
Initially, E & Y and HealthSouth assert that the broad scope of the arbitration agreement in this case is dispositive. Specifically, they argue that the language vesting the arbitration panel with authority to decide "[a]ny issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these [dispute resolution] procedures," represents a First Options clause that is so broad that it is evident on its face that all the demand and proper-party-in-interest issues decided by the trial court in its December 29, 2004, order are subject to redetermination by the arbitrators. However, Tucker responds by pointing to the findings by the trial court that both E & Y and HealthSouth litigated and/or participated in the litigation, up through dispositive rulings by the trial court, concerning both the demand and the proper-party-in-interest issues. Thus, argues Tucker, both E & Y and HealthSouth have waived their right to have these issues determined again by the arbitration panel.
The concept of waiver as applied to arbitration was discussed in Hales, supra:
"Waiver is a `defense to arbitrability.' Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). Accord Ex parte Colquitt, 808 So.2d 1018, 1022 (Ala.2001), and Big Valley Home Ctr., Inc. v. Mullican, 774 So.2d 558 (Ala.2000).

*282 "`It is well settled under Alabama law that a party may waive its right to arbitrate a dispute if it substantially invokes the litigation process and thereby substantially prejudices the party opposing arbitration. Whether a party's participation in an action amounts to an enforceable waiver of its right to arbitrate depends on whether the participation bespeaks of an intention to abandon the right in favor of the judicial process and, if so, whether the opposing party would be prejudiced by a subsequent order requiring it to submit to arbitration. No rigid rule exists for determining what constitutes a waiver of the right to arbitrate; the determination as to whether there has been a waiver must, instead, be based on the particular facts of each case.'
"Companion Life Ins. Co. v. Whitesell Mfg., Inc., 670 So.2d 897, 899 (Ala.1995). Accord Ex parte Allen, 798 So.2d 668 (Ala.2001), and Lee v. YES of Russellville, Inc., 784 So.2d 1022 (Ala.2000)."
885 So.2d at 104.
These consolidated appeals present a question this Court has not previously considered: whether the doctrine of collateral estoppel applies to prevent the arbitration of a particular aspect of a case the parties have contractually agreed is subject to arbitration once that aspect has been the subject of litigation. The gist of E & Y and HealthSouth's argument is that any litigation that took place with respect to the proper-party-in-interest or demand issues and any resulting ruling by the trial court are irrelevant in light of the scope of the arbitration agreement. Under the terms of the arbitration agreement, they say, they are entitled to raise those same issues before, and have them decided by, the arbitration panel.
At the outset, we note that the record supports the trial court's determination, in its March 31, 2005, order denying E & Y and HealthSouth's motions to stay, that both E & Y and HealthSouth litigated the proper-party-in-interest issue and that E & Y also litigated the demand issue, which HealthSouth chose not to contest. The record is plain that both HealthSouth and E & Y were aware of their right to proceed with arbitration, and, indeed, all the parties appear to be in agreement that this consolidated case is subject to arbitration. In spite of this knowledge, E & Y elected to litigate the issues of demand and proper party in interest, ostensibly in the hopes of obtaining the dismissal of Tucker's claims in the trial court without having to proceed to arbitration. Similarly, HealthSouth, although essentially conceding the demand issue, litigated the issue of the proper party in interest in an attempt to supplant Tucker as the plaintiff in control of the litigation. E & Y and HealthSouth's argument concerning the scope of the First Options arbitration provision in this case is, in the final analysis, beside the point. Even assuming, without deciding, that the First Options clause in the arbitration provision was so broad that E & Y and HealthSouth initially had the right to have the arbitration panel decide the arbitrability questions at issue, we must now address the question of collateral estoppel to determine whether by proceeding to litigate the arbitrability questions they relinquished that right.
This Court has recognized that the doctrine of collateral estoppel applies to arbitration proceedings that follow rulings in judicial proceedings. For example, in Brown v. Denson, 895 So.2d 882 (Ala.2004), this Court addressed a claim for benefits by the plaintiff, Denson, a policyholder under a group-disability insurance policy. When her claim was denied by the insurer, Unum Life Insurance Company of *283 America, Denson sued Brown, the independent broker who had sold her the policy, alleging fraud. Brown sought to compel arbitration under a provision in the policy. Denson had already engaged in arbitration with Unum as to her claims against it. The Court concluded that Brown had acted as an independent broker with no agency relationship with Unum and, therefore, that Denson could not be compelled to arbitrate her claims against him. In his dissent, Justice See noted an important principle concerning the applicability of the doctrines of collateral estoppel and res judicata in the arbitration context:
"Unum may be bound in a subsequent arbitration proceeding by rulings in the judicial proceeding between Denson and Brown, thus depriving Unum of the benefit of its contract with Denson. See Lee L. Saad Constr. Co. v. DPF Architects, P.C., 851 So.2d 507, 516 (Ala.2002) (`In Alabama, the "`doctrines of [res judicata and collateral estoppel] apply as well to awards in arbitration as they do to adjudications in judicial proceedings.'"') (quoting Old Republic Ins. Co. v. Lanier, 790 So.2d 922, 928 (Ala.2000), quoting in turn American Ins. Co. v. Messinger, 43 N.Y.2d 184, 189-90, 371 N.E.2d 798, 801, 401 N.Y.S.2d 36, 39 (1977))."
Brown v. Denson, 895 So.2d 882, 889 (Ala.2004).
In Lee L. Saad Construction Co. v. DPF Architects, P.C., 851 So.2d 507 (Ala.2002), referenced in Justice See's dissent, this Court considered the potential preclusive effect in a subsequent court action of a prior arbitration proceeding. After noting, as Justice See's dissent in Denson states, that the doctrines of collateral estoppel and res judicata apply to arbitration awards as well as to judicial proceedings, the Court in Lee L. Saad Construction stated:
"Res judicata and collateral estoppel are two closely related, judicially created doctrines that preclude the relitigation of matters that have been previously adjudicated or, in the case of res judicata, that could have been adjudicated in a prior action.
"`The doctrine of res judicata, while actually embodying two basic concepts, usually refers to what commentators label "claim preclusion," while collateral estoppel . . . refers to "issue preclusion," which is a subset of the broader res judicata doctrine.'
"Little v. Pizza Wagon, Inc., 432 So.2d 1269, 1272 (Ala.1983) (Jones, J., concurring specially). See also McNeely v. Spry Funeral Home of Athens, Inc., 724 So.2d 534, 537 n. 1 (Ala.Civ.App.1998)."
851 So.2d at 516. With respect to the doctrine of collateral estoppel, the Court went on to explain:
"Although Saad Construction [the plaintiff in the court action] could not have asserted its tort claims against the appellees [the defendants in the court action] before the director [of the Alabama Building Commission, as designated arbitrator], collateral estoppel might still apply to prevent Saad Construction from relitigating factual issues common to its claims against the appellees that have already been determined by the director if the elements of collateral estoppel are satisfied. Abramson v. Pennwood Inv. Corp., 392 F.2d 759, 762 (2d Cir.1968); Cream Top Creamery v. Dean Milk Co., 383 F.2d 358, 362-63 (6th Cir.1967); Restatement (Second) of Judgments, § 26, Reporter's Note to comment c(1).6 After holding that the doctrine of res judicata did not bar federal claims over which the state court in the prior action lacked jurisdiction, the United States Court of Appeals for the Second Circuit in Abramson further *284 held: `Of course, where both the state and federal suits are based on the same transactions, collateral estoppel would apply with regard to the facts determined in the state action.' 392 F.2d at 762. Thus, although the prior adjudication in the arbitral forum would not, under the doctrine of res judicata, bar Saad Construction's claims against the appellees, the doctrine of collateral estoppel might nonetheless apply if the requirements for that doctrine are satisfied.
"For the doctrine of collateral estoppel to apply, the following elements must be established:
"`"(1) that an issue in a prior action was identical to the issue litigated in the present action; (2) that the issue was actually litigated in the prior action; (3) that resolution of the issue was necessary to the prior judgment; and (4) that the same parties are involved in the two actions."
"`Smith v. Union Bank & Trust Co., 653 So.2d 933, 934 (Ala.1995). "`Where these elements are present, the parties are barred from relitigating issues actually litigated in a prior [action].'" Smith, 653 So.2d at 934 (quoting Lott v. Toomey, 477 So.2d 316, 319 (Ala.1985)).'
"Biles v. Sullivan, 793 So.2d 708, 712 (Ala.2000). `Only issues actually decided in a former action are subject to collateral estoppel.' Leverette ex rel. Gilmore v. Leverette, 479 So.2d 1229, 1237 (Ala.1985) (emphasis added). . . .
"6 The reporter's note to comment c(1) of § 26 states:
"`When the plaintiff, after having lost a state action, seeks relief with respect to the same transaction under a federal statute enforceable only in federal court, it may be argued that he should be held barred especially if he could have instituted his original suit in federal court where both federal and state grounds could have been considered. . . . It appears sounder, however, not to preclude the federal action by the doctrine of bar, but rather to allow a carry-over decided issue from the state to the federal action by way of issue preclusion. . . . '
"(Emphasis added.) In other words, although res judicata does not bar claims over which the first court lacked jurisdiction, the first court's decisions on issues common to those before the second court may be `carried over' and given binding effect in the second court by the application of the doctrine of collateral estoppel."
851 So.2d at 519-20.
Although the Court in Lee L. Saad Construction recognized that a prior arbitration award could, under the doctrine of collateral estoppel, have a binding effect on a subsequent judicial adjudication of an issue, this Court has conversely also recognized that a prior judicial determination of an issue can have a binding effect under the doctrine of collateral estoppel on a subsequent arbitration award. In Leon C. Baker, P.C. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 821 So.2d 158 (Ala.2001), the Court considered, among other issues, the propriety of an order granting Merrill Lynch's request for an injunction enjoining the arbitration of a claim by a professional corporation ("the PC") seeking to recover for Merrill Lynch's allegedly wrongful disclosure to an adverse third party of the existence of a brokerage account of the principal of the PC, Baker. Merrill Lynch had obtained the injunction on the basis that the claim the PC sought to have arbitrated had been decided adversely to it in a prior decision of the same *285 trial court. In the process of resolving the issue, this Court undertook the following thorough analysis:
"I. Application of the Doctrine of Collateral Estoppel

"A. Who Decides?

"As a threshold matter, Baker and the PC contend that the question of the applicability of the doctrine of collateral estoppel is, itself, arbitrable. In other words, they contend that the trial court erred even in considering whether the doctrine of collateral estoppel was applicable. This determination, they insist, must be made by the arbitrators.
"In Alabama, the doctrine of collateral estoppel will bar the relitigation of a previously resolved issue where (1) the issue and the parties in the second case are the same as the issue and the parties in the first case; (2) the issue was `actually litigated in prior action'; and (3) the `resolution of the issue was necessary to the prior judgment.' Wheeler v. First Alabama Bank of Birmingham, 364 So.2d 1190, 1199 (Ala.1978). The question of who decides whether the arbitration of a previously litigated issue is collaterally estopped appears to be a matter of first impression in this Court.
"The issue has been addressed in other jurisdictions, and those courts have reached divergent conclusions. For example, some courts have held that the preclusive effect of a prior judicial determination is to be decided by a court, rather than an arbitrator: John Hancock Mut. Life Ins. Co. v. Olick, 151 F.3d 132, 139 (3d Cir.1998) (preclusive effect of prior judgments is a matter to be resolved by courts, not arbitrators); In re Y & A Group Sec. Litigation, 38 F.3d 380, 383 (8th Cir.1994) (`The district court, and not the arbitration panel, is the best interpreter of its own judgment.'); Kelly v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 985 F.2d 1067 (11th Cir.), cert. denied, 510 U.S. 1011, 114 S.Ct. 600, 126 L.Ed.2d 565 (1993); C & O Dev. Co. v. American Arbitration Ass'n, 48 N.C.App. 548, 552, 269 S.E.2d 685, 687 (1980) (`the extent of a judgment's binding effect is a matter for judicial determination').
"Some cases hold that the preclusive effect of a prior arbitration proceeding on claims asserted in a subsequent arbitration proceeding is to be decided by the court. Waterfront Marine Constr., Inc. v. North End 49ers Sandbridge Bulkhead Groups A, B & C, 251 Va. 417, 432, 468 S.E.2d 894, 903 (1996) (`the court, not the arbitration panel, determines whether a previous arbitration award operates as res judicata or collateral estoppel on a subsequent action or demand for arbitration'); Monmouth Pub. Sch., Dist. No. 38 v. Pullen, 141 Ill.App.3d 60, 489 N.E.2d 1100, 1105, 95 Ill.Dec. 372 (1985); Rembrandt Indus., Inc. v. Hodges Int'l, Inc., 38 N.Y.2d 502, 344 N.E.2d 383, 384, 381 N.Y.S.2d 451, 452 (1976) (res judicata effect of a prior arbitration is a matter for courts rather than for arbitrators).
"Other courts have held that the preclusive effect of a prior arbitration proceeding on claims asserted in a subsequent arbitration proceeding is arbitrable. See Consolidation Coal Co. v. United Mine Workers of America, Dist. 12, Local Union 1545, 213 F.3d 404 (7th Cir.2000); Chiron Corp. v. Ortho Diagnostic Sys., Inc., 207 F.3d 1126 (9th Cir.2000); Olick, supra, 151 F.3d at 139-40; National Union Fire Ins. Co. of Pittsburgh v. Belco Petroleum Corp., 88 F.3d 129 (2d Cir.1996).
"The appellants cite only one case holding that the preclusive effect of a judgment on claims subsequently asserted in arbitration `is itself arbitrable.' *286 United States Fire Ins. Co. v. National Gypsum Co., 101 F.3d 813, 816 (2d Cir.1996), cert. denied, 521 U.S. 1120, 117 S.Ct. 2512, 138 L.Ed.2d 1015 (1997).
"This case falls in the first category, i.e., those that involve the preclusive effect of a prior judicial determination on claims asserted in a subsequent arbitration proceeding. Clearly, courts in the first two groups cited above would agree that the issue in this case is to be decided by the judiciary. The principle stated in cases representative of the first group is that `even when arbitration is involved, . . . "[c]ourts should not have to stand by while parties re-assert claims that have already been resolved."' In re Y & A Group Sec. Litigation, 38 F.3d at 382 (quoting Kelly, 985 F.2d at 1069). `No matter what, courts have the power to defend their judgments as res judicata, including the power to enjoin or stay subsequent arbitrations.' Id. (Emphasis added.)2
"Courts in the third group have distinguished between cases like this one and those involving a prior arbitration. For example, the court in Olick, which involved both a prior judgment and a prior arbitration, explained:
"`While we have previously held that claims of res judicata based on a prior . . . judgment are an exception, see Telephone Workers Union of New Jersey v. New Jersey Bell Tel. [Co.], 584 F.2d [31], 31-32 (3d Cir.1978), res judicata objections based on a prior arbitration do not implicate the institutional concerns underlying that holding. . . .
"`We have previously held . . . that where there is a contractual provision barring the re-arbitration of similar disputes between parties, the arbitrator is to decide the preclusionary effect, if any, of a previous arbitration. See Local 103 of the International Union of Elec., Radio, and Mach. Workers v. RCA Corp., 516 F.2d 1336, 1340 (3d Cir.1975). The reasoning underlying this approach is that a provision regarding the finality of arbitration awards is a creature of contract and, like any other contractual provision that is the subject of dispute, it is within the province of arbitration unless it may be said "with positive assurance" that the parties sought to have the matter decided by a court.'
"151 F.3d at 139 (emphasis added).
"We agree with the holdings of those courts in the first group, and with the rationales expressed by those in the second and third groups, insofar as they are applicable to a case involving the preclusive effect of a prior judgment.3 Alabama has a strong interest in the finality of its courts' judgments. The courts of Alabama are not authorized to render advisory opinions, except in very limited circumstances. See, e.g., Carrell v. Masonite Corp., 775 So.2d 121, 125 (Ala.2000) (`Alabama's Declaratory Judgment Act bars trial courts from issuing advisory opinions'); Ala. Code 1975, § 12-2-10 (authorizing the Supreme Court to issue advisory opinions on `important constitutional questions' at the request of the Governor or the Legislature). Were we to adopt the position advocated by Baker and the PC, however, we would be establishing a procedure that would transform otherwise binding judicial decisions into mere `advisory opinions.' Thus, Alabama has a strong policy against procedures such as the one advocated by the appellants.
"We conclude that the trial court was the proper forum for Merrill Lynch to present its collateral-estoppel defense. We turn, therefore, to the substance of that defense.

*287 "2 Because courts in the second group ascribe to the judiciary the authority to determine the preclusive effect of even a prior arbitration award, then, a fortiori, they would hold that the court is to decide the effect of a prior judicial determination.
"3 Representative of the cases in the second group is Waterfront Marine Constr., in which the court reasoned:
"`[A]n arbitration panel is not generally bound by legal principles, does not have to explain or justify its decision, and the decision is not reviewed for legal errors. Rather, the arbitrators are entitled to make their decision based on what they deem to be just and equitable within the scope of the parties' agreement. . . . Consequently, when considering a plea of res judicata, an arbitration panel could determine that the issues resolved in a prior arbitration should be revisited, regardless of whether the legal elements required for sustaining the plea were met. Allowing a plea of res judicata to be resolved by arbitration defeats the purpose of the judicially created doctrineto bring an end to the substantive controversy and to protect the parties from relitigating previously decided matters.'
"468 S.E.2d at 903."
821 So.2d at 162-64. Thus, the Court in Leon C. Baker, P.C., determined that the preclusive effect of a prior adjudication upon a subsequent arbitration proceeding was a matter for the trial court's, not the arbitrator's, determination.
With respect to the present case, we note that Tucker and E & Y and HealthSouth have litigated the legal questions of demand and proper party in interest, and the trial court has ruled on those issues. Thus, a redetermination of those issues by the arbitration panel would be barred by the doctrine of collateral estoppel. The trial court's implicit recognition of this fact in its December 29, 2004, order is sustainable and does not constitute reversible error. Further, we note that the doctrine of collateral estoppel is equally applicable to support the trial court's determination that HealthSouth is not entitled to relitigate the proper-party-in-interest issue before the arbitration panel in its counterclaim in case no. CV-05-1618. Although HealthSouth characterizes the trial court's order denying its motion for clarification as a refusal to refer the claims in its counterclaim to arbitration, in fact the trial court's May 9, 2005, order refers HealthSouth's counterclaims in case no. CV-05-1618 to arbitration. However, the determination as to who is the proper party to assert HealthSouth's claims has already been litigated and ruled upon in the trial court and is specifically addressed in the trial court's July 29, 2004, order. HealthSouth's proffer to this Court of evidence outside the record to support its contention that its situation has changed subsequent to the litigation of the issue of the proper party in interest in the trial court, even if it could be considered by this Court, see, e.g., Davant v. United Land Corp., 896 So.2d 475 (Ala.2004); Zaden v. Elkus, 881 So.2d 993 (Ala.2003); and Etherton v. City of Homewood, 700 So.2d 1374 (Ala.1997), does not affect the propriety of the trial court's prior ruling on that issue. In short, Tucker has already been judicially determined to be the proper party to assert HealthSouth's claims against E & Y, and that issue is not subject to relitigation before the arbitration panel.
E & Y and HealthSouth also contest the trial court's reservation of jurisdiction in its December 29, 2004, order to "(a) enforce the arbitration award, (b) rule on the fairness of any settlement under Alabama *288 [Rule of Civil Procedure] 23.1; (c) enforce any settlement agreement; and (d) award attorneys fees should Plaintiff Tucker obtain a recovery for HealthSouth in connection with the arbitration." Essentially, E & Y and HealthSouth argue that the First Options provision of the arbitration agreement at issue is so broad that it encompasses the items the trial court specifically reserved jurisdiction to address. However, the language in the arbitration agreement does not purport to affect matters that occur after arbitration is completed. In fact, with respect to subparts (a) and (c) of paragraph 3 of the trial court's December 29, 2004, order, the arbitration agreement states: "Judgement on any arbitration award may be entered in any court having proper jurisdiction." Further, any settlement resulting from the completion of the arbitration process is still subject to the requirements of Rule 23.1, Ala.R.Civ.P.:
"The action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to shareholders or members in such manner as the court directs."
The trial court's reservation of authority to award Tucker's attorneys a fee from any recovery clearly relates to a speculative eventuality, depending on the outcome of the arbitration and any order resulting from the arbitration relating to attorney fees. We will not predicate reversible error at this point on such a contingent and problematic eventuality.
The trial court's judgments are affirmed.
1040643AFFIRMED.
1040689AFFIRMED.
1041367AFFIRMED.
NABERS, C.J., and LYONS, WOODALL, STUART, SMITH, BOLIN, and PARKER, JJ., concur.
SEE, J., concurs specially.
SEE, Justice (concurring specially).
I agree with the conclusion of the main opinion that the parties to these appeals contractually agreed to arbitrate the questions of demand and proper party in interest but that because those issues were decided in litigation the parties are collaterally estopped from relitigating those issues in arbitration. 940 So.2d at 282. I write specially to explain my rationale that the parties initially waived their right to arbitrate and then later agreed to arbitrate the remainder of the dispute.
"Waiver is generally defined as the intentional relinquishment of a known right." Bell v. Birmingham Broad. Co., 263 Ala. 355, 357, 82 So.2d 345, 347 (1955). Thus, "[w]hether a party's participation in an action amounts to an enforceable waiver of its right to arbitrate depends on whether the participation bespeaks an intention to abandon the right in favor of the judicial process. . . ." Companion Life Ins. Co. v. Whitesell Mfg., Inc., 670 So.2d 897, 899 (Ala.1995). In this case, both parties manifested their intent to abandon their right to arbitrate in favor of the judicial process. On May 22, 2003, E & Y moved to compel arbitration or, in the alternative, to dismiss Tucker's claims based on Tucker's failure to make demand on the board of directors of HealthSouth as required by Rule 23.1, Ala. R. Civ. P. On March 24, 2004, Tucker moved the trial court for an expedited determination of the demand issue. E & Y did not contest Tucker's motion. The trial court held a hearing on April 19, 2004, at which Tucker conceded to a referral of his claims to arbitration. However, HealthSouth refused to refer its claims to arbitration because it wanted to reserve its *289 right to take over Tucker's claims as the proper party in interest. On May 10, 2004, the trial court issued a scheduling order that set out a schedule for briefs on both the demand and proper-party-in-interest issues. On May 28, 2004, HealthSouth filed a brief on the demand and proper-party-in-interest issues with the trial court. In its brief to the trial court, HealthSouth stated that it would stay neutral on the demand issue and that it would not seek dismissal on that ground. HealthSouth also stated in its brief to the trial court that it was the proper party to litigate Tucker's derivative claims against E & Y. On July 16, 2004, E & Y submitted a brief to the trial court in which it insisted that the trial court decide both the demand and proper-party-in-interest issues. On the same day, HealthSouth moved the trial court to substitute and realign the parties so that HealthSouth could litigate Tucker's derivative claims against E & Y. In addition, HealthSouth sought leave to file a proposed amended complaint against E & Y so that HealthSouth could pursue Tucker's derivative claims against E & Y. On July 26, 2004, the trial court held oral arguments on the demand and proper-party-in-interest issues. On July 29, 2004, the trial court issued two orders. The first order held that demand on the HealthSouth board was excused and denied E & Y's motion to dismiss. The second order denied HealthSouth's motion to realign and to substitute itself for Tucker as the proper party in interest and denied HealthSouth's motion to file an amended complaint asserting claims against E & Y. Neither E & Y nor HealthSouth appealed these orders, nor did they assert that the trial court did not have jurisdiction to decide those issues because the issues had been contractually reserved for arbitration. HealthSouth and E & Y's actions in briefing the trial court and arguing the demand and proper-party-in-interest issues bespeak an intention to abandon their right to arbitration in favor of the judicial process. See Companion Life, 670 So.2d at 899. Moreover, "`[i]t is well settled under Alabama law that a party may waive its right to arbitrate a dispute if it substantially invokes the litigation process. . . .'" Hales v. ProEquities, Inc., 885 So.2d 100, 105 (Ala.2003) (quoting Companion Life, 670 So.2d at 899). E & Y substantially invoked the litigation process by urging the trial court to decide the issues of demand and proper party in interest. HealthSouth substantially invoked the litigation process by refusing to refer its claims to arbitration at the April 19, 2004, hearing and seeking leave from the trial court in its July 16, 2004, motion seeking to file an amended complaint against E & Y. HealthSouth and E & Y manifested the intent to abandon the right to arbitrate in favor of litigation and substantially invoked the judicial process, thereby waiving their right to arbitration. Therefore, the trial court had jurisdiction to rule on the issues of demand and proper party in interest, and that part of its order referring Tucker's claims to arbitration that prohibits the re-litigation of those issues is valid.
After litigating the issues of demand and proper party in interest, the parties agreed to refer all of their remaining claims to arbitration. They did not agree to submit the previously litigated matters of demand and proper party in interest to arbitration[5]E & Y and HealthSouth did wish to have the arbitrator decide those issues, but Tucker did not. For these reasons, the trial court had jurisdiction to *290 rule on the issues of demand and proper party in interest; the arbitrator has jurisdiction over the matters subsequently submitted to arbitration; and the doctrine of collateral estoppel applies to the issues litigated and sought to be submitted to arbitration by E & Y and HealthSouth.
NOTES
[1] Allegations of wrongdoing by officers and directors of HealthSouth and associated business entities have prompted other lawsuits in other jurisdictions. See, e.g., Biondi v. Scrushy, 820 A.2d 1148 (Del.Ch.2003); In re HealthSouth Shareholders Litig., 845 A.2d 1096 (Del.Ch.2003), affirmed, 847 A.2d 1121 (Del.2004) (table); and Teachers' Retirement Sys. of Louisiana v. Scrushy, Civ.A. 20529, March 2, 2004 (Del.Ch.2004)(not reported in A.2d). See also cases pending in the United States District Court for the Northern and Middle Districts of Alabama, United States v. Scrushy, [Ms. 2:05-CR-119-MEF, February 2, 2006] (M.D.Ala.2006) (not published in F.Supp.2d); SEC v. Scrushy, 261 F.Supp.2d 1298 (N.D.Ala.2003); In re HealthSouth Corp. (Sec.Litig.), CV-02-BE-2105-S, filed March 27, 2003; and Mirken v. HealthSouth, CV-03-BE-0696-S, filed March 27, 2003.
[2] E & Y's motion also sought other relief, which will be discussed in more detail as the procedural details of this case are set out infra.
[3] In pertinent part, Rule 23.1 provides:

"In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall be verified and shall allege that the plaintiff was a shareholder or member at the time of the transaction of which the plaintiff complains or that the plaintiff's share or membership thereafter devolved on the plaintiff by operation of law. The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort. The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association. The action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to shareholders or members in such manner as the court directs."
[4] E & Y's argument that Tucker's claims were duplicative of the claims in the Federal Derivative Actions was not pursued in the trial court and is not at issue in this appeal. In the litigation in Teachers' Retirement, supra, E & Y and HealthSouth took the position that Tucker was an appropriate party to assert claims on behalf of HealthSouth.
[5] I know of no principle denying a person the right to give up a legal right he previously secured through litigation.